


FILED

Oct 04 2018, 1:55 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Indiana Supreme Court

Supreme Court Case No. 18S-CR-00166

## David Wright,

*Appellant (Defendant below),*

—v—

## State of Indiana,

*Appellee (Plaintiff below).*

Argued: May 17, 2018 | Decided: October 4, 2018

Appeal from the Blackford Circuit Court, No. 05C01-1601-F1-36
The Honorable Dean A. Young, Judge

On Petition to Transfer from the Indiana Court of Appeals,
No. 05A02-1610-CR-02397

**Opinion by Justice Goff**

Chief Justice Rush and Justices David, Massa, and Slaughter concur.

**Goff, Justice.**

Nearly a century ago, this Court adopted and applied the exclusionary rule to Indiana's jurisprudence. The rule provides: When, in violation of Article 1, Section 11 of the Indiana Constitution, the State gains evidence by illegal means (i.e., an unreasonable search or seizure), it may not then use that evidence against the defendant. Through the fruit of the poisonous tree doctrine, we've extended the exclusionary rule to exclude evidence directly or derivatively obtained from the illegal conduct. This present case tests that rule's limits. Specifically, this case asks, as a matter of Indiana constitutional law, does an illegal seizure and search irreparably stain **all** derivative evidence the police gain afterwards, making it inadmissible under the exclusionary rule, or can the evidence be sufficiently separated from that primary taint to be admissible? In simpler terms, does the attenuation doctrine apply in Indiana constitutional law?

While the Court of Appeals previously confronted these questions—and split over the answers—they are novel questions for us that we answer today. We hold the attenuation doctrine can apply under the Indiana Constitution. Evidence found after an unreasonable search or seizure can become attenuated from that illegality, meaning the evidence itself or the circumstances in which the evidence was discovered were sufficiently distinguishable or separated from the search or seizure. In this particular case, we find the challenged evidence—the defendant's statements to law enforcement—were amply attenuated from the illegal search. We, therefore, affirm the defendant's child-molestation convictions.

# Factual and Procedural History

Defendant David Wright lived with his best friend's young family in an apartment located at 220 East Water Street in Hartford City, Indiana. Wright and the family were home on the afternoon of Friday, January 22, 2016, when the FBI and Indiana State Police SWAT, in the course of a federal child pornography investigation, knocked on the door.

Based upon information that an IP address located and billed to 220 ½ East Water Street, Hartford City, Indiana, accessed known child pornography websites, FBI Special Agent Jeffrey Robertson secured a federal search warrant for the home. Upon arriving, Robertson realized the large home housed two smaller apartments, upstairs and downstairs units. The upstairs apartment's street address being 220 ½ East Water Street and the downstairs apartment's address being 220 East Water Street—Wright's residence.

While searching the upstairs apartment and seizing the computer equipment therein, Agent Robertson learned both apartments shared the same internet connection, all occupants knew the password, and all occupants used the connection. Rather than securing a second search warrant for 220 East Water Street and instead of having 220's occupants sign written consent forms he kept in his vehicle, Robertson gave 220's occupants (including Wright) two options: (1) verbally consent to a search of their computer equipment, surrender those devices that day, and receive them back quickly; or (2) leave the residence and stay away until he secured and executed another federal search warrant. 220's occupants (including Wright) verbally consented to the search, handed over their computers, and provided Agent Robertson with their usernames and passwords.

Agent Robertson seized the equipment and searched them over the weekend. The search—done by running software called OS Triage on the seized devices—revealed Wright's computer contained hash values matched to known child pornography images. Equipped with this information, Agent Robertson returned to the East Water Street apartments on Monday, January 25th, and released all the seized computer equipment, except Wright's.

When Wright inquired about his devices, Agent Robertson asked to speak with him privately, giving him the option of talking inside or outside the house. Wright chose to talk outside. Agent Robertson and Wright went to the former's car parked in front of the house. Agent Robertson sat in the driver's seat, Wright sat in the front passenger seat, and another officer sat in the backseat. Before beginning a conversation,

Robertson told Wright the car was unlocked, and he could leave at any point. Agent Robertson informed Wright he was not under arrest.

After Wright indicated he understood those warnings, Agent Robertson confronted him with the search results. He asked Wright if he used the TOR network[1] to search for child pornography and Wright answered affirmatively. Agent Robertson informed Wright that standard protocol required him to conduct a forensic interview with any children living in the home "just to make sure that no [sexual] contact has occurred." Wright then admitted having sexual contact with two children living in the home.

With this disclosure, Agent Robertson immediately stopped the interview, exited the vehicle, and phoned Hartford City Police to report what Wright just told him. The police asked Robertson to place Wright under arrest and take him to the station. Robertson returned to the car, informed Wright he was now under arrest, and handcuffed him. After transporting Wright to the Hartford City Police Department, Robertson handed Wright over to Detective Cody Crouse, but he stuck around to sit through the interview.

Detective Crouse read Wright the standard *Miranda* warnings. Wright signed a waiver form and agreed to talk to Crouse. During that interview, Wright admitted to repeatedly molesting two children, W.S. (age 11) and F.S. (age 4) over a year's span, with the most recent sexual contact occurring within the last two weeks.

The State charged Wright with four counts of Level 1 felony child molesting: two counts for the sexual contact with W.S. and two counts for the sexual contact with F.S.

---

[1] Agent Robertson testified that "TOR" stands for The Onion Router. Tr. 16. He likened TOR to the "dark web" where websites are theoretically "completely anonymous and completely unidentifiable." *Id.* at 17. He explained that when a person accesses a website via the TOR network the site's identifying information "will bounce between hundreds of servers across the world," making it nearly impossible for law enforcement to track and subpoena every server. *Id.*

Wright moved to suppress all evidence obtained from the FBI search and subsequent police interviews. Invoking the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution, Wright alleged he'd been illegally detained and searched. Specifically, he argued he did not give valid consent to search his computers because Agent Robertson failed to inform him that he had the right to refuse consent. Following a hearing on Wright's motion, the trial court granted in part, and denied in part. Finding that Wright's consent to the search proved invalid under both the federal and state constitutions, the trial court suppressed evidence obtained from searching Wright's computer and electronic equipment. But the court denied suppression of Wright's statements to Agent Robertson and Detective Crouse, concluding they were sufficiently independent and attenuated from the illegal search.

Wright's incriminating statements were admitted during the subsequent bench trial. The court found Wright guilty as charged, and, after identifying aggravators and mitigators, imposed an aggregate sixty-year sentence. The court deemed Wright a sexually violent predator and a credit restricted felon.

Wright appealed, arguing the trial court erred by only partially granting his suppression motion and by admitting his statements to law enforcement. He also argued his sixty-year sentence proved inappropriate since he had no criminal history, he admitted his crimes, he appreciated the wrongfulness of his conduct, and he had been victimized as a child.

The Court of Appeals reversed Wright's convictions, holding the trial court improperly admitted Wright's confessions to Agent Robertson and Detective Crouse. *Wright v. State*, 92 N.E.3d 1127 (Ind. Ct. App. 2018). The court focused its analysis on Article 1, Section 11, particularly whether Indiana's jurisprudence recognized the attenuation doctrine as an exception to the exclusionary rule. *Id.* at 1131–33. It ultimately rejected the attenuation doctrine for Indiana. *Id.* at 1132–33.

Upon removing attenuation from its legal calculus, the court concluded: "[T]here is no dispute that Wright's incriminating statements to the officers on January 25, 2016, about touching the children directly resulted from or derived from the unconstitutional search and seizure of

Wright's computers." *Id.* at 1133. The court deemed Wright's statements fruit of the poisonous tree and, therefore, inadmissible evidence. *Id.* Because the Court of Appeals reversed Wright's convictions, it did not address the parties' arguments about the appropriateness of Wright's sentence. *Id.*

The State sought transfer, arguing the Court of Appeals had divided over this issue. In order to resolve the split in authority, we granted transfer, thereby vacating this Court of Appeals opinion. Ind. Appellate Rule 58(A).

## Standard of Review

The primary issue before us is whether Wright's statements to law enforcement constitute admissible evidence against him. The trial court answered that query in the affirmative and admitted the statements. Since decisions to admit or exclude evidence fall within the trial court's sound discretion, we afford those decisions deference and review them for an abuse of discretion. *Guilmette v. State*, 14 N.E.3d 38, 40 (Ind. 2014). We will reverse a trial court's decision to admit evidence only if the decision was "clearly against the logic and effect of the facts and circumstances and the error affects [the defendant's] substantial rights." *Id.*

However, to the extent the issue of admissibility turns upon a constitutional query, we review the issue de novo, paying no deference to the lower court's constitutional determinations. *Id.* at 40–41.

## Discussion and Decision

Rooted deeply within Indiana constitutional law lies the principle that when police obtain evidence by way of an unreasonable search or seizure the evidence is excluded at the defendant's trial. *Callender v. State*, 193 Ind. 91, 96, 98, 138 N.E. 817, 818–19 (1923). The exclusionary rule is not required by the Indiana Constitution's text—meaning, Article 1, Section 11 itself does not expressly mandate that courts suppress evidence got by illegal means. Rather, the exclusionary rule represents a judicially-created

remedy aimed first at deterring police misconduct and second at securing Hoosiers' rights. *See Membres v. State*, 889 N.E.2d 265, 273–74 (Ind. 2008) (identifying "deterrence as the primary objective of [Indiana's] exclusionary rule," but recognizing our exclusionary rule also protects citizens' privacy). Our exclusionary rule dates back ninety-five years, nearly forty years before the United States Supreme Court made the federal exclusionary rule applicable to the states through the Fourteenth Amendment. *Membres*, 889 N.E.2d at 274 (citing *Mapp v. Ohio*, 367 U.S. 643 (1961)). *See also Callender*, 138 N.E. 817.

One branch of Indiana's exclusionary rule—universally known as the fruit of the poisonous tree doctrine—operates to omit from trial evidence directly or derivatively obtained from an illegal search or seizure. *Gyamfi v. State*, 15 N.E.3d 1131, 1136 (Ind. Ct. App. 2014). Once a defendant establishes that a search or seizure was unreasonable, he can invoke the fruit of the poisonous tree doctrine by moving to suppress direct and derivative evidence. *Id.*

Over the years, Indiana courts have occasionally cultivated the rule to achieve the purpose of deterring police misconduct. For example, Indiana law recognizes two exceptions to the exclusionary rule and fruit of the poisonous tree doctrine. One being the good-faith exception, where illegally obtained evidence is not excluded if law enforcement acted in "objectively reasonable reliance" on what they thought was a valid warrant. *Mers v. State*, 482 N.E.2d 778, 782–83 (Ind. Ct. App. 1985) (quoting *United States v. Leon*, 468 U.S. 897, 927 (1984) (Blackmun, J., concurring)). *See also Hopkins v. State*, 582 N.E.2d 345, 351 (Ind. 1991) (recognizing *Mers* held the federal good-faith exception applicable to Article 1, Section 11 claims); Ind. Code § 35-37-4-5 (2014 Repl.) (codifying the good-faith exception). The other being the new-crime exception, which allows for the admission of "evidence that defendants committed new and distinct crimes in response to illegal searches or seizures by law enforcement." *C.P. v. State*, 39 N.E.3d 1174, 1183 (Ind. Ct. App. 2015). With these exceptions, we note that Indiana's exclusionary rule does not countenance but-for exclusion where any and all evidence obtained after an illegal search or seizure is automatically excluded, no matter what.

Indeed, such a broad application would choke out the rule's narrow purposes.

Today we must decide whether to further prune our exclusionary rule to include the attenuation doctrine.[2] This concept, accepted within federal Fourth Amendment jurisprudence, holds that "not . . . all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police[;]" *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963), rather, the objected-to evidence will be excluded as fruit of the poisonous tree if police obtained it by exploiting the primary illegality, *id.* at 488. Alternatively, evidence will be admitted if it is attenuated from the illegality—if it is obtained by "means sufficiently distinguishable to be purged of the primary taint." *Id.* (citation omitted). *See also Clark v. State*, 994 N.E.2d 252, 266–73 (Ind. 2013) (considering whether federal attenuation doctrine applied to a search and seizure that violated the Fourth Amendment).

But just because federal Fourth Amendment jurisprudence accepts and applies the attenuation doctrine does not necessarily mean Indiana's Article I, Section 11 jurisprudence will follow suit. The Indiana Constitution demands from this Court independent analysis considering that charter's uniqueness. *Holder v. State*, 847 N.E.2d 930, 940 (Ind. 2006). And so, before we can resolve whether Indiana constitutional law embraces attenuation, we must first reflect upon Indiana's distinctive

---

[2] Whether Indiana's exclusionary rule includes the attenuation doctrine is a matter of first impression for this Court, although the Court of Appeals splintered when considering the question. *Compare Trotter v. State*, 933 N.E.2d 572, 583 (Ind. Ct. App. 2010) ("[W]e hold that the attenuation doctrine has no application under the Indiana Constitution."), *and Gyamfi*, 15 N.E.3d at 1137 ("[T]he attenuation doctrine has no place in the jurisprudence of Article 1, Section 11 of the Indiana Constitution."), *with Turner v. State*, 862 N.E.2d 695, 700–02 (Ind. Ct. App. 2007) (applying the attenuation doctrine, but suppressing evidence obtained from an illegal search because the evidence was not sufficiently attenuated from the original taint), *and State v. Foster*, 950 N.E.2d 760, 763 n.2 (Ind. Ct. App. 2011) (finding attenuation applicable to an Article 1, Section 11 challenge, but also acknowledging the *Trotter* court rejected the attenuation doctrine).

approach to securing Hoosiers' rights against unreasonable searches or seizures.

## I. Reasonableness provides the animating principle for all Article 1, Section 11 inquiries and must guide the decision on attenuation.

This Court has said many times that although Article 1, Section 11 of the Indiana Constitution and the Fourth Amendment to the United States Constitution share vocabulary, they part company in application. When developing Indiana's Article 1, Section 11 test for evaluating a challenged search or seizure, this Court eschewed the federal reasonable-expectation-of-privacy test, *Litchfield v. State*, 824 N.E.2d 356, 359–60 (Ind. 2005), opting instead for a test "focused on whether the actions of the government were 'reasonable' under the 'totality of the circumstances,'" *Shotts v. State*, 925 N.E.2d 719, 726 (Ind. 2010) (quoting *Litchfield*, 824 N.E.2d at 359). Consequently, Indiana courts evaluate a search or seizure on a case-by-case basis, asking whether the police behaved reasonably considering the totality of the circumstances. *Brown v. State*, 653 N.E.2d 77, 79 (Ind. 1995). *See also Litchfield*, 824 N.E.2d at 359–61. And this Court often emphasizes how reasonableness is the touchstone for Article 1, Section 11 inquiries. *See, e.g., id*; *Shotts*, 925 N.E.2d at 726; *Holder*, 847 N.E.2d at 940. Likewise, "[t]he focus of the exclusionary rule under the Indiana Constitution is the reasonableness of police conduct." *C.P.*, 39 N.E.3d at 1182.

Reasonableness, therefore, should shape our answer to the attenuation question. Is it reasonable to admit evidence obtained after an illegal search or seizure if the State shows that evidence was sufficiently attenuated from the initial police misconduct? We answer yes, for two important, intertwining reasons—the exclusionary rule's purpose and the attenuation doctrine's function as the natural limit to exclusion.

## A. Adopting the attenuation doctrine into Indiana constitutional law would not thwart the exclusionary rule's purpose.

Article 1, Section 11's purpose "is to protect from unreasonable police activity, those areas of life that Hoosiers regard as private." *Mitchell v. State*, 745 N.E.2d 775, 786 (Ind. 2001) (quoting *Brown v. State*, 653 N.E.2d at 79). The exclusionary rule, especially the fruit of the poisonous tree doctrine, furthers this purpose through discouraging unreasonable police activity by excluding illegally obtained evidence. Indeed, "[t]he exclusionary rule is designed to deter police misconduct." *State v. Spillers*, 847 N.E.2d 949, 957 (Ind. 2006) (quoting *Hensley v. State*, 778 N.E.2d 484, 489 (Ind. Ct. App. 2002)). The deterrence objective, though, is a binary concept. The necessary complement to deterrence is protecting citizens from constitutional violations. By deterring police intrusions on Hoosiers' privacy, the exclusionary rule also helps secure citizens' constitutional rights. *See Membres*, 889 N.E.2d at 273 ("We . . . exclude [evidence] because we consider it necessary to protect the privacy of all citizens from excessive intrusion by law enforcement."); *id.* at 277 ("[T]he exclusionary rule was adopted not only to deter police misconduct but also to protect the integrity of the judicial process and to protect the rights of criminal defendants.") (Sullivan, J., dissenting).

But deterrence-based exclusion is not a one-size-fits-all remedy that merits but-for application in every situation. There could be some situations where excluding evidence would not fulfill the rule's purpose of deterring future constitutional violations. Sometimes the police realize their mistake and correct the behavior before securing new evidence. In some cases, derivative evidence becomes so remote in time, place, or agency from the original taint that excluding it would not deter future police misconduct.

No matter how principled the purpose behind exclusion, it exacts a heavy societal cost, which cautions against applying it as a but-for rule. We've acknowledged that excluding evidence impairs "the truth-finding objective of trials" because excluded evidence is often relevant, reliable, and probative. *Membres*, 889 N.E.2d at 272. Omitting this evidence from

trial can result in a guilty person going free—which undoubtedly undercuts society's interest that criminals be punished. And so we've cautioned that "[b]ecause there is this cost to enforcing the exclusionary rule, it should be done **only** where appropriate to advance its [deterrent] purpose." *Id.* at 274 (emphasis added).

This tension between deterring police misconduct and punishing guilty criminals only strengthens our view that the attenuation doctrine strikes the right balance between these competing interests.

## B. By evaluating the totality of the circumstances surrounding an illegal search or seizure, the attenuation doctrine acts as a reasonable check on the exclusionary rule's fruit of the poisonous tree doctrine.

The United States Supreme Court recently explained "[t]he attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence." *Utah v. Strieff*, 579 U.S. ___, 136 S. Ct. 2056, 2061 (2016). The federal attenuation doctrine distills that causation evaluation to a three-factor test: (1) "[T]he temporal proximity between the unconstitutional conduct and the discovery of evidence," in other words, "how closely the discovery of evidence followed the unconstitutional search[;]" (2) "[T]he presence of intervening circumstances[;]" and, most importantly, (3) "[T]he purpose and flagrancy of the official misconduct." *Id.* at 2062 (internal quotation marks omitted) (quoting *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)). In application, the federal attenuation doctrine essentially considers the totality of the circumstances surrounding the illegality and the discovered evidence.

By parsing the causal chain between the illegal search or seizure and the derivative evidence, the attenuation doctrine necessarily poses important questions like when, what, where, why, how the police obtained the objected-to evidence. Asking these questions helps courts examine the means by which police gained evidence following the initial illegality. When did police find the evidence? How much time passed between the illegality and securing the evidence? What intervening events

occurred in that time frame? Did the police discover the evidence where the illegality occurred? How did the evidence present itself, through police action or through the defendant or through a third party? If answering these questions reveals the means of discovering the evidence were sufficiently separated from the illegal search or seizure by time, circumstances, location, and agency, then the link between the initial unreasonable search or seizure and the derivative evidence becomes sufficiently attenuated that the evidence is admissible.

As we see it, by examining the causal chain between the illegality and the discovered evidence or looking at the totality of the circumstances, attenuation is the natural, reasonable limit to the exclusionary rule's fruit of the poisonous tree doctrine. *See State v. Eserjose*, 259 P.3d 172, 179–80 (Wash. 2011) (reasoning "the attenuation doctrine defines the parameters of the 'fruit of the poisonous tree' doctrine" since the two "stem from the same source"); *Commonwealth v. Damiano*, 828 N.E.2d 510, 518 (Mass. 2005) (citation omitted) (explaining that since the attenuation doctrine asks whether the police exploited the illegality to gain evidence, "the attenuation rule is 'not an exception to the exclusionary rule but a test of its limits'"); *Wong Sun*, 371 U.S. at 487–88 (announcing the first iteration of the attenuation doctrine).

## C. Indiana constitutional law embraces the attenuation doctrine.

Considering Indiana's unique constitution and our emphasis on reasonableness in the totality of the circumstances, we think the attenuation concept fits nicely within our jurisprudence. Indiana law has not endorsed a but-for exclusionary rule that automatically excludes all derivative evidence acquired from an illegal search or seizure. And the attenuation doctrine sets the outer limits for exclusion by tailoring the rule to its purpose—deterring police misconduct and defending Hoosiers' privacy rights. Today we hold the attenuation doctrine applies to claims challenging the reasonableness of a search or seizure under Article 1, Section 11.

## II. Indiana's attenuation doctrine parallels the federal doctrine to the extent it considers the totality of the circumstances.

Having decided the attenuation doctrine applies to claims brought under Article 1, Section 11 of the Indiana Constitution, we must determine how to evaluate if evidence is sufficiently distinguishable or attenuated from the illegal search or seizure to become admissible at trial. In other words, what should Indiana's attenuation doctrine look like?

Thus far, Indiana's exclusionary rule parallels the federal rule in three areas. First, the two rules share similar origins and histories. *Mers*, 482 N.E.2d at 782 n.6. Early iterations of the federal rule cited the Fifth Amendment right against self-incrimination and Fourth Amendment right to be free from unreasonable searches and seizures as bases for excluding illegally obtained evidence. *Id.* Likewise, Indiana's nascent exclusionary rule relied upon the Indiana Constitution's counterparts: Article 1, Section 14 (self-incrimination) and Article 1, Section 11 (unreasonable searches and seizures). *Id.* Second, the rules already share two familiar exceptions. Like federal jurisprudence, Indiana law adopted the good-faith and new-crime exceptions. Third, the federal and state exclusionary rules share the same prime purpose—deterring police from illegal conduct. *Membres*, 889 N.E.2d at 273 (citing *Spillers*, 847 N.E.2d at 957) ("Indiana search and seizure jurisprudence, like federal Fourth Amendment doctrine, identifies deterrence as the primary objective of the exclusionary rule.").

Since Indiana's exclusionary rule compares to the federal rule, it reasons that our attenuation doctrine parallel (but not parrot) the federal exception. The theoretical and practical differences between Article 1, Section 11 and the Fourth Amendment prevent us from simply copying the federal rule. As we have said, the two provisions differ in both application and scope. Because Article 1, Section 11 hinges upon reasonableness considering the totality of the circumstances, this "Indiana provision in some cases confers greater protections to individual rights than the Fourth Amendment affords." *Shotts*, 925 N.E.2d at 726. These

differences, however, do not demand a different attenuation test for Indiana.

Precisely because Indiana places as paramount what is reasonable in light of the totality of the circumstances and because the Indiana Constitution can offer more protection, it follows that Indiana's attenuation exception **begin** with the federal three-part test but not necessarily end there. An attenuation inquiry under Article 1, Section 11 will begin by considering three elements: (1) the timeline—particularly, the time elapsed between the illegality and the acquisition of the evidence; (2) the intervening circumstances—what, if any, intervening circumstances occurred in that time; and (3) the police misconduct. This third element, like the federal test, scrutinizes the purpose and egregiousness behind the official misconduct. It examines whether the police exploited the initial illegality to gain more evidence against the defendant and then whether "the evidence came from the 'exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Turner v. State*, 862 N.E.2d 695, 701 (Ind. Ct. App. 2007) (citation omitted). *See also Wong Sun*, 371 U.S. at 488; *Brown*, 422 U.S. at 603.

We anticipate that most of the facts and circumstances in any given case will fall into one of these three categories. We, therefore, see this three-part test as a good starting point for considering attenuation because it essentially looks at the totality of the circumstances. To be sure, the above test considers the entire timeline, what happens during that timeline, and scrutinizes the police's misconduct—which comports with Indiana's Article 1, Section 11 precedent. *See Brown v. State*, 653 N.E.2d at 79 (focusing on the police activity). But even so, we will not rigidly limit ourselves to only these three factors. Every case must be considered on the totality of the circumstances. If other factors present themselves, they will be considered.

## III.   Wright's confessions were admissible evidence.

Turning to these particular facts and applying the above totality-of-the-circumstances test, we find Wright's statements to Agent Robertson and

Detective Crouse sufficiently attenuated from the illegal search that we will not exclude them. Specifically, the timing of Wright's statements, the intervening circumstances between the search and the statements, and the non-flagrant, non-exploitative police misconduct, amply attenuate the evidence from the illegal search and seizure. Wright's incriminating statements, therefore, constituted admissible evidence at his trial.

## A. The timeline

A weekend passed between the illegal search and seizure. Agent Robertson took possession of Wright's computers on a Friday afternoon and Wright's incriminating statements came on the following Monday. He had two full days, free from police presence, to mull his options or decide what to say when Robertson returned. Yet he did not seek counsel from friends, family, or an attorney. Wright did not have to make a split-second decision on whether to speak with police; he had the benefit of time. His confessions cannot be attributed to mid-search nervous ramblings. Wright's statements were temporally detached from the illegality.

## B. The intervening circumstances

Much happened between the search and Wright's confessions. Wright initiated a conversation with law enforcement by inquiring into when he would get back his computer equipment. Though not under arrest, he voluntarily spoke with Agent Robertson. And, without being asked, Wright admitted that he had sexual contact with W.S. and F.S.

Only after this disclosure did Agent Robertson formally arrest Wright and take him to the Hartford City Police Department. There Wright received *Miranda* warnings (both written and oral) and waived *Miranda*. Then he participated in a voluntary discussion with Detective Crouse where he admitted to the molestations. These are compelling intervening circumstances supporting attenuation.

## C. The police misconduct

The police did not commit flagrant misconduct here or exploit the illegal search. Based on his testimony at the suppression hearing, Agent Robertson believed he presented Wright with two constitutional options: give verbal consent or wait for a federal search warrant. In fact, he testified that FBI procedure allowed him to get either written or verbal consent to a warrantless search. Although he thoroughly discussed the two options with 220's occupants, Agent Robertson failed to inform them (and Wright) that they could refuse consent. That omission prompted the trial court to suppress the evidence from the search. While we certainly don't condone Robertson's oversight, especially when he had consent forms in his vehicle, his failure to tell Wright he could refuse consent does not strike us as flagrant misconduct.

What's more, this record does not suggest the police manipulated Wright's invalid consent to search his computers in order to coerce him into confessing to child molestation. Agent Robertson arrived at Wright's home in the course of a federal child-pornography investigation. He did not suspect Wright to be a child molester.

When Agent Robertson spoke with Wright on the Monday following the search and seizure, he took pains to make sure Wright understood he was not under arrest and not required to talk to him. He allowed Wright to choose where they spoke. Once in the car, he reminded Wright the car doors were unlocked, and Wright could stop the conversation and leave at any time.

Only after Wright admitted to having child pornography on his computers did Agent Robertson say that FBI protocol required him to speak to any children living in the home. He did not ask Wright if he had any sexual contact with the children, but Wright voluntarily confessed to the molestations. Robertson immediately ended the interview and sought direction from local police because his federal investigation just gained a state layer.

Upon taking custody of Wright, the Hartford City Police behaved reasonably. The record does not suggest Detective Crouse exploited the

illegal search. Detective Crouse *Mirandized* Wright and obtained a written waiver from him before interviewing him.

Considering the totality of the circumstances—the timeline, the intervening circumstances, and the police misconduct—we conclude that Wright's confessions were sufficiently attenuated from the unreasonable search so as to be purged of the primary taint. There was a meaningful time gap between the search and Wright's confessions during which he had no further contact with law enforcement. Once he did encounter law enforcement again, Wright voluntarily spoke with Agent Robertson and Detective Crouse and disclosed he molested two children. And scrutinizing the police conduct here shows that law enforcement did not flagrantly flout Wright's constitutional right against unreasonable searches and the police did not exploit that illegal search to secure his confessions. Accordingly, Wright's statements amounted to admissible evidence, and the trial court rightly admitted them.

## IV.   Wright's 60-year sentence is not inappropriate.

Since it reversed the convictions, the Court of Appeals did not address Wright's argument that his sixty-year sentence proved inappropriate considering his crime and character. Wright requested we revise his sentence downward to thirty years and the State countered by asking us to revise the sentence upward to 120 years. Having granted transfer and taking jurisdiction over this matter, we are duty-bound to address these arguments now. Ind. Const. art. 7, § 6 (guaranteeing the right to one appeal); Ind. Crim. Rule 11; *Clark v. State*, 506 N.E.2d 819, 821 (Ind. 1987).

The Indiana Constitution gives this Court the power to review and revise criminal sentences. art. 7, § 4. "We may revise a sentence authorized by statute, if, after due consideration of the trial court's decision, we find the sentence inappropriate in light of the nature of the offense and the character of the offender." *Gibson v. State*, 51 N.E.3d 204, 215 (Ind. 2016) (citing App. R. 7(B)). The defendant "bears the burden of persuading us that his sentence is inappropriate." *Id.*

We find that Wright did not meet his burden here. He argued his character alone merited a lesser sentence; specifically, Wright noted he had no criminal history, he admitted his crimes, he appreciated the wrongfulness of his conduct, and he had been victimized as a child. We find these reasons unconvincing, especially in light of the crimes he committed. Over the course of a year, Wright repeatedly molested two of his best friend's young children. He occasionally filmed himself abusing four-year-old F.S. and showed it to eleven-year-old W.S. During this time Wright also viewed and downloaded child pornography. No positive character traits, no matter how admirable or sympathetic, can redeem these crimes.

The State rightly points out that our constitutional authority to review and revise criminal sentences under Article 7, Section 4 also includes the power to **increase** a defendant's sentence. *See Kimbrough v. State*, 979 N.E.2d 625, 630 (Ind. 2012); *Carpenter v. State*, 950 N.E.2d 719, 721 (Ind. 2011); *Akard v. State*, 937 N.E.2d 811, 813 (Ind. 2010); *McCullough v. State*, 900 N.E.2d 745, 750 (Ind. 2009). But we decline to exercise that power here. Wright's sixty-year sentence essentially amounts to a life-sentence for this thirty-three-year-old credit restricted felon. Even though Wright committed unspeakable crimes against children, we think his sixty-year sentence not inappropriate.

## Conclusion

Today we hold that the Indiana Constitution embraces the attenuation doctrine. In our view, the attenuation concept settles well into Indiana's distinctive constitutional landscape since it essentially considers what is reasonable given the totality of the circumstances. By grafting the attenuation doctrine onto our Article 1, Section 11 jurisprudence we fix it as the reasonable, natural limit to the exclusionary rule. In application, our attenuation test will begin by examining the timeline between the illegality and finding the derivative evidence, the intervening circumstances occurring over that timeline, and the initial police misconduct. But if other circumstances arise strengthening or weakening attenuation, then they must also be considered. Applying this test here,

we conclude Wright's statements to law enforcement were sufficiently attenuated from the illegal search so as to be purged of the original taint and these were admissible at trial. We, therefore, affirm Wright's convictions.

Rush, C.J., and David, Massa, and Slaughter, JJ., concur.

ATTORNEY FOR APPELLANT
Chris M. Teagle
Muncie, Indiana

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana