FILED

Mar 30 2017, 6:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Ivan A. Arnaez
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Luke M. Warren,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | March 30, 2017<br><br>Court of Appeals Case No.<br>87A01-1606-CR-1399<br><br>Appeal from the Warrick Superior<br>Court<br><br>The Honorable Robert R.<br>Aylsworth, Judge<br><br>Trial Court Cause No.<br>87D02-1312-FB-442 |

**Altice, Judge.**

## Case Summary

[1] Following a jury trial, Luke M. Warren was convicted of class B felony dealing in methamphetamine and class D felony possession of chemical reagents or

precursors with the intent to manufacture a controlled substance. Warren raises two issues on appeal:

1. Did the trial court admit evidence against Warren that was obtained in violation of his rights under the Fourth Amendment to the United States Constitution?

2. Was Warren denied the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution because his lawyer also represented Warren's codefendant?

[2] We affirm.

## Facts & Procedural History

[3] On December 18, 2013, Indiana State Trooper Matthew Lockridge and Warrick County Sheriff's Deputy Jarrett Busing went to Warren's mobile home as the result of a tip regarding the manufacturing of methamphetamine at that location. Deputy Busing was familiar with Warren and had been to his home on prior occasions.

[4] They arrived at 9:06 p.m. and parked halfway down Warren's long driveway. The rest of the driveway and the surrounding area was extremely muddy, with wooden pallets leading in different directions to approach the residence. There were three doors to the home – the east/front door, the north door leading to the driveway where a truck was parked five or six steps away, and the west door in the back, which was a glass door with a screen. There was an outside light on in the back.

[5] As the officers approached the home, they both detected a chemical odor that they knew through their training and experience to be commonly associated with the manufacturing of methamphetamine. Deputy Busing identified it as the smell of ether, and Trooper Lockridge indicated that it was a chemical smell that he had smelled before at other methamphetamine labs.

[6] Deputy Busing approached the front door and knocked and announced his presence loudly while Trooper Lockridge stood watch on the north side of the home near the truck. No one answered the front door, so Deputy Busing moved to the two other doors and continued to knock and yell loudly. He also knocked on windows. In the meantime, Trooper Lockridge felt the hood of the truck and looked to see if anyone was inside the truck. At the same time, he observed a burn pile next to the truck that had stripped batteries and a pseudoephedrine box on top of the pile in plain sight.

[7] After numerous failed attempts to reach someone inside, the officers drove their vehicles back up to the roadway and out of view of Warren's home. As they discussed their next course of action and contacted other officers, Warren's mother, Diana, arrived on the scene around 10:00 p.m. Ostensibly there to check the mail, Diana asked the officers why they were there and whether Warren was in trouble. Deputy Busing indicated that they were investigating and that if she went down to the residence he would follow. Diana decided to leave.

[8] Believing that Diana had come at the request of her son, the officers walked back down to the residence. They observed that the outside light had been turned off. Additionally, Deputy Busing noted that it looked as if the back door had been opened. Deputy Busing knocked at that door. Shortly thereafter, Warren and his live-in girlfriend, Melody Corsentino, walked around from the other side of the mobile home and spoke with him. Deputy Busing explained why they were there and noted the chemical odor and the items observed in the burn pile. Warren responded that he had a problem with his neighbors throwing their "meth trash" on his property. *Trial Transcript* at 44.

[9] Deputy Busing asked Warren for consent to search the mobile home, but Warren indicated that his mother owned the property and her consent would be required. At Trooper Lockridge's request, Warren called Diana, and she came to the scene. Thereafter, around 11:00 p.m., both Diana and Warren signed consents to search the home.

[10] After officers located a few items related to methamphetamine use and manufacturing, Warren began questioning the consent that he had signed. At that point, the officers stopped the search, secured the residence, and applied for a search warrant. The search warrant was obtained in the early morning hours, and officers resumed the search. Throughout the home, officers found a plethora of items used in the manufacturing of methamphetamine, as well as methamphetamine residue and paraphernalia.

[11] On December 20, 2013, the State charged Warren with class B felony dealing in methamphetamine (Count I) and class D felony possession of chemical reagents or precursors with the intent to manufacture a controlled substance (Count II). The State also alleged that Warren was a habitual substance offender (Count III).

[12] Warren filed a motion to suppress on September 9, 2014, arguing that his consent to search was not voluntarily given. Deputy Busing and Trooper Lockridge testified at the suppression hearing. Defense counsel argued that what started as a consensual encounter – the knock and talk – transformed into a seizure when the officers continued to knock and yell and not leave the property when no one answered. The trial court took the matter under advisement and then denied the motion on October 5, 2014.

[13] Warren's jury trial concluded on March 2, 2016, with the jury finding him guilty as charged on Counts I and II. Warren then stipulated that he had two prior substance abuse convictions, and the trial court determined that he was a habitual substance offender. On April 22, 2016, the trial court vacated the judgment of conviction on Count II and sentenced Warren to a total of seven years in prison on Counts I and III.

[14] On May 20, 2016, Warren filed a motion to correct error arguing that his right to counsel was violated when his privately-retained trial counsel represented both Warren and his codefendant, Corsentino, in separate trials. The trial court denied the motion on June 7, 2016. Warren now appeals.

## Discussion & Decision

### 1. Fourth Amendment

[15] Warren argues that evidence was admitted at trial in violation of his rights under the Fourth Amendment. He acknowledges that the officers had a right to perform a knock and talk at his front door. He contends, however, that when he did not answer the door, the officers were required to leave the property. According to Warren, Deputy Busing's continued knocking on doors and windows and yelling transformed what began as an attempt to engage in a consensual encounter into an unconstitutional seizure invalidating Warren's subsequent consent to search.

[16] Subject to certain recognized exceptions, the Fourth Amendment prohibits warrantless searches and seizures inside a home and its curtilage (i.e., the area immediately surrounding and associated with the home). *J.K. v. State*, 8 N.E.3d 222, 229 (Ind. Ct. App. 2014). No unreasonable search occurs, however, when police enter areas of curtilage impliedly open to use by the public to conduct legitimate business. *Hardister v. State*, 849 N.E.2d 563, 570 (Ind. 2006). This includes knock and talks where police use normal routes of ingress and egress to make appropriate inquiries of the occupants. *Id*. Of course, the occupants have no obligation to open the door or to speak to police. *Id*. And when the knock is not answered, officers generally must leave and secure a warrant if they want to pursue the matter. *Id*. "Conduct that occurs on one's curtilage that is beyond a

traditional 'knock and talk' is subject to Fourth Amendment protection." *J.K.*, 8 N.E.3d at 229.

[17] In this case, Deputy Busing and Trooper Lockridge went to Warren's home to speak with him after receiving a tip regarding the manufacturing of methamphetamine at that location. They drove down the driveway as far as they could and then walked the rest of the way to the residence. Deputy Busing went and knocked on the front door while Trooper Lockridge waited in the driveway near the residence and truck. The officers' actions at this point, as Warren agrees, did not violate the Fourth Amendment. From this vantage point, both officers smelled a chemical odor they associated with the manufacturing of methamphetamine. Trooper Lockridge also observed in plain view items associated with such manufacturing on a burn pile next to the truck. Because of these observations, Deputy Busing knocked and yelled longer, louder, and in more locations than he would in a typical knock-and-talk situation. Warren would have us ignore the additional observations made by the officers while legally on his property. But that would not be reasonable.

[18] In *Holder v. State*, 847 N.E.2d 930, 939 (Ind. 2006), our Supreme Court agreed with a line of federal cases concluding that "a belief that an occupied residence contains a methamphetamine laboratory, which belief is found on probable cause based largely on observation of odors emanating from the home, presents exigent circumstances permitting a warrantless search for the occupants' safety." The Court recognized the volatile nature of methamphetamine labs and held that the warrantless entry was justified in that case by exigent

circumstances where the officers smelled ether and learned that there were occupants, including a young child, inside the home. *Id.* ("Because the officers' reasons for the warrantless entry included their concern for substantial risk of immediate danger to an occupant from the highly flammable and explosive atmosphere in the home, their warrantless entry was justified by exigent circumstances.").

In the case at hand, Deputy Busing and Trooper Lockridge were not aware that the home was occupied during their initial entry onto the curtilage of Warren's property. Thus, they could not – and indeed did not – make a warrantless entry into Warren's home based on exigent circumstances. This is not to say, however, that they could not engage in a reasonable investigation to determine whether there were occupants inside the mobile home from which the chemical odor was emanating.

The touchstone of the Fourth Amendment is reasonableness. *J.K.*, 8 N.E.3d at 229. *See also Terry v. Ohio*, 392 U.S. 1, 19 (1968) ("the central inquiry under the Fourth Amendment [is] the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security"). And while suspicion of criminal activity is not an exception to the warrant requirement, circumstances may arise that would justify a decision by officers to stay on an individual's curtilage. *See J.K.*, 8 N.E.3d at 233.

Warren directs us to *U.S. v. Jerez*, 108 F.3d 684 (7th Cir. 1997) as an "instructive damning case". *Appellant's Brief* at 40. In that case, deputies conducted a knock

and talk at a quiet motel room late at night. When the occupants did not answer, the deputies continued to knock for several minutes and announce verbally that they were police and wanted the door opened. One of the deputies then began knocking on the window and shining a light through it. The Seventh Circuit concluded:

> Once the officers had been refused admittance, their continued efforts to rouse the occupants out of bed certainly prevented them from ignoring the continued requests and from maintaining the privacy and solitude of their dwelling. The deputies' persistence, in the face of the refusal to admit, transformed what began as an attempt to engage in a consensual encounter into an investigatory stop.

*Id.* at 691-692.

The *Jerez* court went on to explain that if an occupant refuses to answer the door and police take additional steps to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the resulting seizure. *See id*. at 692. The Seventh Circuit indicated that because the deputies' actions, when considered in their totality, amounted to an investigatory stop, the deputies needed reasonable suspicion that criminal activity was afoot to go beyond the traditional knock and talk. *Id*. at 693. Because the Seventh Circuit found reasonable suspicion lacking, it held that the defendant's consent to search obtained almost immediately following the illegal seizure was invalid. *Id*. at 693-95.

Unlike in *Jerez*, Deputy Busing and Trooper Lockridge had reasonable suspicion to broaden their investigation once they smelled the chemical odor, known to be associated with the manufacturing of methamphetamine, and observed precursors on the burn pile. At a minimum, given the volatile nature of such an environment, they were permitted to intensify their knocking and announcing to determine whether there were occupants at risk inside the home. *Cf. Hardister*, 849 N.E.2d at 570-71 (although officers conducting a knock and talk following an anonymous tip could not make a warrantless entry into the home when they observed the occupants fleeing toward the back of the residence in a high crime area, the officers had reasonable suspicion to pursue the fleeing individuals by entering the rear curtilage of the residence to make a *Terry* stop[1]).

Viewed in their totality, the officers' actions complied with the Fourth Amendment standard of reasonableness and constituted a reasonable response to the suspicion created by the odor regarding a possible danger inside the home. Thus, Warren's subsequent consent to search was not rendered invalid

---

[1] "A *Terry* stop is a lesser intrusion on the person than an arrest and may include a request to see identification and inquiry necessary to confirm or dispel the officer's suspicions." *Id*. at 570. In *Hardister*, the Court acknowledged that this was not a typical *Terry* case involving a seizure in a public place. *Id*. at 571. The Court, however, rejected defendant's argument that police may never invade the curtilage of a residence without probable cause and a warrant or exigent circumstances. The Court explained, "[t]he mere fact that officers enter curtilage to conduct an otherwise lawful *Terry* stop does not ipso facto render the physical invasion of the curtilage an unlawful search." *Id*.

by the officers' preceding actions, and the extensive evidence found inside the home was properly admitted at trial.

## 2. Sixth Amendment

[25] Warren argues that his Sixth Amendment right to counsel was denied when his trial attorney also represented Corsentino, his codefendant, in a separate trial, which took place after Warren's trial. He asserts that at no time did counsel or the trial court explain to him the ramifications of dual representation or seek an express waiver of any possible conflicts of interest. Further, Warren notes that counsel did not call Corsentino as a witness at his trial.

[26] Warren acknowledges that he did not object at trial to the dual representation, and he does not argue that the trial court knew or should have reasonably known that a particular conflict existed. Thus, the trial court had no obligation to *sua sponte* inquire into the propriety of such representation. *See Cuyler v. Sullivan*, 446 U.S. 335, 346 (1980) ("Absent special circumstances, therefore, trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist.").

[27] It is well established that, absent a timely objection, dual representation will not violate the Sixth Amendment unless it gives rise to an actual conflict of interest. *Id*. at 348. In other words, a reviewing court cannot presume that a possibility for conflict resulted in ineffective assistance of counsel. Rather, "a defendant who raised no objection at trial must demonstrate that an actual conflict of

interest adversely affected his lawyer's performance." *Id. See also Williams v. State*, 529 N.E.2d 1313, 1315 (Ind. Ct. App. 1988).

[28] Aside from bald assertions, Warren has presented no evidence from the record establishing that an actual conflict of interest existed that adversely affected counsel's performance. As the Supreme Court observed in *Cuyler*, the provision of separate trials significantly reduces the potential for a divergence in the interests of codefendants. *Id*. at 347. Moreover, there is no evidence in the record that Warren and Corsentino advanced different or conflicting defense theories[2] or that they had divergent interests. *See Williams*, 529 N.E.2d at 1315 ("Conflict of interest occurs whenever one defendant stands to gain significantly by counsel advancing plausible arguments that are damaging to a co-defendant whom counsel is also representing.").

[29] Warren contends that the trials were separated due to a *Bruton* problem. *See Bruton v. United States*, 391 U.S. 123, 124-26 (1968) (in a joint trial, admission of one defendant's confession that implicates another defendant is a violation of the second defendant's Sixth Amendment right to confront witnesses and, thus, the trials must be severed). In light of the alleged *Bruton* problem, Warren claims that counsel's performance was *per se* impaired even though the trials

---

[2] Contrary to his assertion on appeal, the defense advanced at trial was not that *only* Corsentino manufactured methamphetamine in the home. Rather, defense counsel argued that the State had not presented adequate evidence that methamphetamine had been manufactured in the home. Counsel emphasized during closing argument that, among other things, no active lab was found, several key components were not found, the burn pile was not hot when the officers arrived, and no significant quantity of methamphetamine was discovered in the home.

were severed. Warren, however, presents no evidence regarding the *Bruton* problem. We do not know who gave a statement or what that statement contained. *See Fayson v. State*, 726 N.E.2d 292, 294 (Ind. 2000) ("a co-defendant's statements present a *Bruton* problem only if they 'facially incriminate' another defendant").

[30] Finally, Warren asserts, again with no evidentiary support, that his counsel refused to call Corsentino as a witness because counsel also represented her. As an initial matter, Warren does not present any evidence that counsel still represented Corsentino at the time of Warren's trial. Further, counsel may have had strategic reasons for not calling her as a witness in his trial.

[31] Because Warren chose to raise this issue in a motion to correct error and on direct appeal rather than on post-conviction review, facts in support of his claim are woefully lacking. We refuse to indulge in speculation and assumptions regarding pivotal facts. Thus, we conclude that Warren has failed to establish an actual conflict of interest adversely affected his trial counsel's performance.

[32] Judgment affirmed.

Riley, J. and Crone, J., concur.