

IN THE

# Court of Appeals of Indiana

State of Indiana,

*Appellant-Plaintiff*

v.

Jeremiah Allen Hendricks, Sr.,

*Appellee-Defendant*



FILED

Mar 12 2025, 9:17 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

March 12, 2025

Court of Appeals Case No.
24A-CR-972

Appeal from the Tippecanoe Superior Court

The Honorable Steven P. Meyer, Judge

Trial Court Cause No.
79D02-2302-F2-17

---

**Opinion by Judge May**
Judge Pyle concurs.
Judge Brown dissents with a separate opinion.

**May, Judge.**

[1] The State appeals following the trial court's order granting the motion to suppress filed by Jeremiah Allen Hendricks, Sr. The State raises one issue for our review, which we revise and restate as whether law enforcement's incursion onto the curtilage of Hendricks's home in the middle of the night violated the Indiana Constitution's prohibition against unreasonable search and seizure. We affirm.

## Facts and Procedural History[1]

[2] At approximately 11:30 p.m. on March 10, 2023, Officer Daniel Anthrop and Officer Steven Ceballos-Olieas of the Lafayette Police Department went to Hendricks's house. Hendricks's son Giovanni Hendricks ("Giovanni") was a known associate of Damarion Jackson, and the police were looking for Jackson because Jackson was a suspect in a recent shooting and there was an active warrant for Jackson's arrest. The officers knew Giovanni had lived at Hendricks's house approximately two years earlier, but they did not have any information that he was living there at the time of their visit.

[3] Both Officer Anthrop and Officer Ceballos-Olieas parked their marked police cars down the street from Hendricks's residence. After the two officers

---

[1] On August 21, 2024, this Court granted the State's motion to substitute exhibit, and the State subsequently submitted the substituted exhibit. The substituted exhibit contained three video files. On August 27, 2024, the State filed a notice indicating that only the largest of the three video files had been submitted as evidence at the suppression hearing. We acknowledge the State's notice and considered only the largest video file in rendering our opinion.

conferred, Officer Ceballos-Olieas walked through Hendricks's side yard around to the back of Hendricks's house. He stationed himself behind the house to ensure that no one exited the back of the residence. Meanwhile, Officer Anthrop walked through Hendricks's front yard to the front door. Officer Anthrop smelled the odor of marijuana while standing outside the front door. He turned away from the front door without knocking, walked to the side of Hendricks's house to assess where the side windows were located, and then returned to his police cruiser. Officer Anthrop contacted his shift supervisor and "[s]he requested before [Officer Anthrop and Officer Ceballos-Olieas] started the search warrant process that [they] attempt contact at the front door." (Tr. Vol. 2 at 30.)

[4]  At 11:48 p.m., Officer Anthrop and Officer Ceballos-Olieas approached Hendricks's front door. Officer Anthrop repeatedly rang the doorbell and knocked, but Hendricks did not answer the door. Officer Anthrop then walked away from Hendricks's front door through Hendricks's yard and back to his police cruiser. Officer Ceballos-Olieas walked back through the side yard of Hendricks's house and continued observing the back of the residence. Officer Anthrop applied for a search warrant based on the odor of marijuana, and the trial court granted the warrant. Shortly after 1:00 a.m. on March 11, 2023, officers used a battering ram to enter through the front door of Hendricks's house and served the search warrant on Hendricks, who was home with his infant son. During the search of Hendricks's house, the officers found several

firearms and large quantities of marijuana and psilocybin mushrooms. Police arrested Hendricks.

[5] The State subsequently charged Hendricks with one count of Level 2 felony conspiracy to commit dealing in a schedule 1 controlled substance,[2] three counts of Level 2 felony dealing in a schedule 1 controlled substance,[3] one count of Level 5 felony conspiracy to commit dealing in marijuana,[4] one count of Level 5 felony dealing in marijuana,[5] one count of Level 6 felony possession of marijuana,[6] two counts of Level 6 felony possession of a controlled substance,[7] one count of Level 6 felony neglect of a dependent,[8] and one count of Class B misdemeanor possession of marijuana.[9]

[6] On October 10, 2023, Hendricks filed a motion to suppress seeking exclusion of "all information or evidence gathered after law enforcement's unlawful search of Mr. Hendricks's curtilage." (App. Vol. 2 at 38.) Hendricks asserted the officers' actions at his house on March 10, 2023, violated his rights under the Fourth Amendment to the United States Constitution. The trial court held an

[2] Ind. Code § 35-41-5-2 & Ind. Code § 35-48-4-2(f).

[3] Ind. Code § 35-48-4-2(f).

[4] Ind. Code § 35-41-5-2 & Ind. Code § 35-48-4-10(d)(2)(A)(i).

[5] Ind. Code § 35-48-4-10(d)(2)(A)(i).

[6] Ind. Code § 35-48-4-11(c)(1).

[7] Ind. Code § 35-48-4-7(b).

[8] Ind. Code § 35-46-1-4(a)(1).

[9] Ind. Code § 35-48-4-11(a)(1).

evidentiary hearing on Hendricks's motion to suppress on November 1, 2023. On January 12, 2024, the trial court issued an order granting Hendricks's motion to suppress. The State then filed a motion to correct error arguing Hendricks was not prejudiced by the officers' conduct because the challenged evidence would have inevitably been discovered had Officer Anthrop followed the paved path to Hendricks's front door rather than cutting through the yard. On February 26, 2024, the trial court entered an order granting the State's motion to correct error. The trial court concluded that the previously excluded evidence was admissible pursuant to the inevitable discovery exception to the Fourth Amendment's exclusionary rule and reversed its suppression order.

[7] Hendricks then filed another motion to suppress evidence arguing that the officer's search of his curtilage violated the Indiana Constitution. On April 2, 2024, the trial court issued an order granting the motion to suppress. The trial court concluded that the degree of concern or suspicion that a violation had occurred was low. It explained:

> Police had no evidence or suspicion the Defendant was involved in any criminal activity. They were there to conduct a "knock and talk" in an effort to locate a person they suspected was involved in a shooting that occurred a week prior. They had information that the person they were looking for had prior associations with Defendant's child(ren). They had no immediate information that the suspect was present or would be found inside Defendant's residence.

(*Id*. at 105.) The trial court also found "the degree of intrusion was great considering the time and manner in which police approached the porch, or

curtilage, of the residence." (*Id*.) With respect to the extent of law enforcement needs, the trial court determined that while attempting to speak with Hendricks or Giovanni may have been a legitimate law enforcement purpose, "there were no emergencies or immediate exigent circumstances that existed at that time of night to justify police by-passing the normal routes of approach to the house." (*Id*.) The trial court also concluded "[t]he 'Inevitable Discovery' exception to an invalid search is not found in the Indiana Constitution. . . . Thus, the odor of marijuana discovered by police after they improperly approached Defendant's porch cannot be admitted under an 'Inevitable Discovery' theory." (*Id*. at 106.)

## Discussion and Decision

[8] The State asserts the trial court erred when it concluded that the actions of Officer Anthrop and Officer Ceballos-Olieas violated the Indiana Constitution. Because the State appeals from a negative judgment, it bears the burden of showing that the trial court's order was contrary to law. *State v. Serrano*, 136 N.E.3d 249, 252-53 (Ind. Ct. App. 2019), *trans. denied*. An order granting a motion to suppress is contrary to law when the evidence is without conflict and all reasonable inferences lead to a conclusion other than that reached by the trial court. *State v. E.R.*, 123 N.E.3d 675, 679 (Ind. 2019), *cert. denied*, 141 S. Ct. 130 (2020). "The State cannot make this showing if there is substantial, probative evidence supporting the suppression ruling." *Id*. We review the trial court's factual findings deferentially – neither reweighing the evidence nor

judging the credibility of the witnesses – and the trial court's legal conclusions de novo. *State v. Keck*, 4 N.E.3d 1180, 1183 (Ind. 2014).

[9] Article 1, section 11 of the Indiana Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

"The legality of a governmental search under the Indiana Constitution turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances." *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind. 2005). Whether a search or seizure is reasonable under the totality of the circumstances generally turns on the balance of three factors: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Id.* at 361.

[10] We evaluate the first *Litchfield* factor by looking at the information available to the officers at the time of the search or seizure. *Hardin v. State*, 148 N.E.3d 932, 943 (Ind. 2020). The State contends Jackson and Giovanni were "known to be members of the same gang" and several days earlier, they "had been observed in Lafayette leaving the scene of a shooting together in a white car." (Appellant's Br. at 12-13.) In addition, the State notes Officer Anthrop testified fugitives often stay with friends or family members to avoid apprehension.

However, Officer Anthrop and Officer Ceballos-Olieas had no specific information that either Giovanni or Jackson was at Hendricks's house. They knew Giovanni had lived at the house approximately two years earlier, but they had no indication that he was living there on March 10, 2023. There was no reason for the officers to believe Jackson was staying at Hendricks's house as opposed to the residence of any other friend or family member. Thus, the officers' degree of concern, suspicion, or knowledge of criminal activity was low because they had nothing more than a generalized suspicion that they might find either Giovanni or Jackson at Hendricks's house. *See Jacobs v. State*, 76 N.E.3d 846, 852 (Ind. 2017) (holding first *Litchfield* factor weighed against the State because while "officers had sufficient cause to be suspicious of Jacobs in general, that suspicion was not sufficiently linked to any articulable criminal activity").

[11] Moving to the second *Litchfield* factor, Article 1, section 11 of the Indiana Constitution protects against warrantless intrusions both into the house and onto the curtilage—the area immediately surrounding and associated with the house. *See Holder v. State*, 847 N.E.2d 930, 941 (Ind. 2006) (analyzing whether officer's incursion onto the curtilage of defendant's home was reasonable under the Indiana Constitution). However, "[n]o unreasonable search occurs when police enter areas of curtilage impliedly open to use by the public to conduct legitimate business." *Hardister v. State*, 849 N.E.2d 563, 570 (Ind. 2006). This implicit license "includes knock and talks where police use normal routes of ingress and egress to make appropriate inquiries of the occupants." *Warren v.*

*State*, 73 N.E.3d 203, 207 (Ind. Ct. App. 2017). The resident is not obligated to open the door, "[a]nd when the knock is not answered, officers generally must leave and secure a warrant if they want to pursue the matter." *Id*. Here, Officer Ceballos-Olieas went through Hendricks's side yard and positioned himself a short distance away from the back of Hendricks's house. This is not a typical route of ingress or egress and was a more invasive intrusion of the curtilage than a private visitor is implicitly authorized to make. Officer Anthrop's approach was less intrusive because, even though he cut across Hendricks's front yard, his destination was the area outside the front door where visitors are implicitly authorized to stand when attempting to contact a house's occupants.

[12]　Nonetheless, Officer Anthrop approached Hendricks's front door at 11:30 p.m. That is not a time when people expect to be disturbed by uninvited visitors. *See, e.g.*, Carmel (Ind.) City Code § 4-26(c)(1) ("Door-to-door solicitation by vendors may be conducted in the City between the hours of 9:00 a.m. and dusk, local time.") & City of Bloomington (Ind.) Municipal Code § 4.16.140 (prohibiting door-to-door solicitation between dusk and 8:00 a.m.). The State directs us to *Carpenter v. State*, 974 N.E.2d 569 (Ind. Ct. App. 2012). In that case, we held the officers' approach of a suspect's residence at 12:30 a.m. to serve an arrest warrant was minimally intrusive. *Id*. at 575. We explained that an arrest warrant carries with it limited authority for the police to enter a suspect's dwelling to effectuate an arrest, and it was reasonable for the officers to conclude the subject of the search was inside the residence "given the late hour, the vehicles in the driveway, and the lights on at the residence[.]" *Id*. at

573. In contrast, Officer Anthrop was not serving an arrest warrant. He was simply seeking information regarding Jackson's whereabouts. While Officer Anthrop smelled the odor of marijuana before knocking on the front door, he still exceeded societal norms by approaching the front door to summon the house's occupants at a time when the occupants rightfully expected not to be disturbed. Considering both Officer Anthrop's approach in the middle of the night and Officer Ceballos-Olieas's walk through the side yard, we conclude the degree of intrusion was high. *See*, *e.g.*, *Divello v. State*, 782 N.E.2d 433, 439 (Ind. Ct. App. 2003) (holding officer invaded the curtilage of homeowner's property by walking through the yard beyond where visitors could be expected to go), *trans. denied*.

[13] We assess the third *Litchfield* factor by looking at both "the needs of the officers to act in a general way" and "the needs of the officers to act in the particular way and at the particular time they did." *Hardin*, 148 N.E.3d at 946-47. The State points to law enforcement's need to look for Jackson. However, there was no emergency or exigent circumstance that required the officers to approach Hendricks's house at 11:30 p.m. While Jackson was a suspect in a recent shooting, the shooting occurred several days earlier, and the police were not responding to an active threat when they traversed onto the curtilage of Hendricks's house. The officers may have had a legitimate law enforcement need to speak with Hendricks to gain information about the location of either Jackson or Giovanni, but their need to do so in the middle of the night was minimal. *Cf. Masterson v. State*, 843 N.E.2d 1001, 1007 (Ind. Ct. App. 2006)

(holding the extent of law enforcement need to perform warrantless search of vehicle was high when suspect was seen minutes earlier fleeing the scene of an armed robbery in the vehicle), *trans. denied*.

Therefore, considering the totality of the circumstances, we hold the entry of Officer Anthrop and Officer Ceballos-Olieas onto Hendricks's property at 11:30 p.m. on March 10, 2023, was unreasonable under the Indiana Constitution, and we affirm the trial court's grant of Hendricks's motion to suppress.[10] *See*, *e.g.*, *Duran v. State*, 930 N.E.2d 10, 19 (Ind. 2010) (holding officers' entry into defendant's apartment was unreasonable under the Indiana Constitution when the officers' suspicion that wanted individual was inside apartment was low, the degree of intrusion was high, and law enforcement's need to enter the apartment was low).

## Conclusion

The incursion of Officer Anthrop and Officer Ceballos-Olieas onto Hendricks's property at 11:30 p.m. was unreasonable under the Indiana Constitution. The officers' degree of suspicion that a suspect or an associate of the suspect was

---

[10] The State also argues that the evidence seized from Hendricks's house "should not be suppressed because the evidence eventually seized was attenuated from the officer's conduct." (Appellant's Br. at 18-19.) However, the search warrant authorizing law enforcement to search Hendricks's residence was premised on Officer Anthrop's smell of marijuana emanating from the house, which only occurred after Officer Anthrop unconstitutionally trod upon the curtilage of Hendricks's house. Therefore, the trial court properly suppressed the evidence. *See*, *e.g.*, *Turner v. State*, 862 N.E.2d 695, 702 (Ind. Ct. App. 2007) (holding traffic stop violated the Indiana Constitution and evidence derived from the stop had to be suppressed).

inside the house was low, the degree of intrusion was high, and the level of law enforcement need was low. Accordingly, we affirm the trial court.

[16] Affirmed.

Pyle, J., concurs.
Brown, J., dissents with a separate opinion.

ATTORNEYS FOR APPELLANT

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Daylon L. Welliver
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Terrance Kinnard
Kinnard, Rowley, Powers, Jimenez
Indianapolis, Indiana

**Brown, Judge, dissents with a separate opinion.**

[17] I respectfully dissent from the result reached by the majority. With respect to the degree of concern, suspicion, or knowledge that a violation has occurred, Officer Anthrop was looking for Jackson who was wanted for an escape charge and was a suspect in a recent shooting. A few days prior to the shooting, Giovanni was identified with Jackson in the area of the shooting and both were documented gang members of the same gang. While Officer Anthrop did not have information that Giovanni, a known associate of Jackson, was living at his father's residence, he knew that Giovanni had previously lived at the residence.

[18] As for the degree of intrusion the method of the search or seizure imposed on the citizen's ordinary activities, Officer Anthrop merely walked across the front yard of the residence to the front door where he immediately detected the odor of marijuana. Specifically, at the suppression hearing, Officer Anthrop testified, "I approached the door and when I approached the door, I observed the odor of marijuana coming from the inside of the residence." Transcript Volume II at 23. While he approached the residence at approximately 11:30 p.m., Officer Anthrop testified that a light was on upstairs at that time.[11] Officer Anthrop did not knock on the door or disturb the residents before detecting the odor of marijuana. I cannot say that the time of day of Officer Anthrop's approach of

---

[11] While the majority phrases the issue as whether law enforcement's incursion onto the curtilage of Hendricks's home "in the middle of the night" violated the Indiana Constitution's prohibition against unreasonable search and seizure, I note that Officer Anthrop initially approached the residence at 11:30 p.m. and saw that a light was on.

the front door alone should determine the outcome. It was only after the search warrant had been obtained that the officers entered the residence. With respect to the entry, the video reveals that the police activated the emergency lights on their vehicles, which appear to be parked in the yard of the residence, at approximately 1:02 a.m. State's Exhibit 2. The officers made an announcement over a loudspeaker at 1:03:08-1:03:15 a.m., which stated "Police Department. Search Warrant. Residents of 3717 Tesla Drive come to the front door now." *Id.* At 1:03:55 a.m., an officer knocked on the front door and announced, "Lafayette Police Department. Come to the door." *Id.* An officer began striking the front door with a battering ram at 1:04:17 a.m. *Id.* Given that the residents were given multiple opportunities to open the door prior to forceful entry I would find that the degree of intrusion the method of the search or seizure imposed on the citizen's ordinary activities was not unreasonable.

[19] With regard to the extent of law enforcement needs, Officer Anthrop was attempting to locate a fugitive and suspect in a recent shooting. While approaching the front door of a residence with a light on, Officer Anthrop detected the odor of marijuana which served as the basis for the search warrant. Under these circumstances, I would conclude that Officer Anthrop's actions leading up to his discovery of the odor of marijuana coming from the residence were reasonable.

[20] Even assuming that some of the officers' other conduct was improper, I still conclude that reversal is warranted. In *Wright v. State*, the Indiana Supreme Court held that the attenuation doctrine can apply under the Indiana

Constitution. 108 N.E.3d 307, 311 (Ind. 2018). The Court observed, "As we see it, by examining the causal chain between the illegality and the discovered evidence or looking at the totality of the circumstances, attenuation is the natural, reasonable limit to the exclusionary rule's fruit of the poisonous tree doctrine." *Id.* at 317 (citing in part *Commonwealth v. Damiano*, 444 Mass. 444, 828 N.E.2d 510, 518 (2005) (citation omitted) (explaining that since the attenuation doctrine asks whether the police exploited the illegality to gain evidence, "the attenuation rule is 'not an exception to the exclusionary rule but a test of its limits'")).

[21]     The Court held:

> An attenuation inquiry under Article 1, Section 11 will begin by considering three elements: (1) the timeline—particularly, the time elapsed between the illegality and the acquisition of the evidence; (2) the intervening circumstances—what, if any, intervening circumstances occurred in that time; and (3) the police misconduct. This third element, like the federal test, scrutinizes the purpose and egregiousness behind the official misconduct. It examines whether the police exploited the initial illegality to gain more evidence against the defendant and then whether "the evidence came from the 'exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Turner v. State*, 862 N.E.2d 695, 701 (Ind. Ct. App. 2007) (citation omitted). *See also Wong Sun* [*v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407 (1963)]; *Brown* [*v. Illinois*, 422 U.S. 590, 603, 95 S. Ct. 2254 (1975)].

*Id.* at 318. "[T]he above test considers the entire timeline, what happens during that timeline, and scrutinizes the police's misconduct—which comports with

Indiana's Article 1, Section 11 precedent." *Id.* "[E]ven so, we will not rigidly limit ourselves to only these three factors." *Id.* "Every case must be considered on the totality of the circumstances. If other factors present themselves, they will be considered." *Id.*

[22] With respect to the timeline, Officer Anthrop detected the odor of marijuana emitting from the residence after he approached the front door. In the Affidavit of Probable Cause related to the initial search warrant, Officer Anthrop asserted:

> Affiant went up to the door of the residence and could smell the odor of burnt marijuana [emitting] from inside the residence. Affiant observed [the residence] is a two-story, single-family residence with numbers . . . affixed to the mailbox in front of the residence. Affiant recognized the odor to be marijuana based on his training and experience as a law enforcement officer which includes training at the Law Enforcement Academy on drug recognition where Affiant was shown samples of marijuana so he could become familiar with the appearance and odor of marijuana, and during the . . . of Affiant's experience as a law enforcement officer, he has encountered similar odors on numerous occasions where plant material was found which Affiant recognized as marijuana based on its appearance and pungent odor and which field tested positive for marijuana.

Exhibits Volume 3 at 4.[12] Thus, the initial search warrant was based upon Officer Anthrop's detection of marijuana and was not based upon any observations by Officer Ceballos-Olieas.

[23] As for the intervening circumstances, the record reveals perhaps problematic conduct such as Officer Ceballos-Olieas walking toward the rear of the residence, but this action occurred either after or simultaneously with Officer Anthrop's detection of the odor of marijuana. With respect to the police misconduct, I cannot say that the police committed flagrant misconduct or exploited any illegal search.

[24] Considering the totality of the circumstances, I would conclude that Officer Anthrop's detection of marijuana, which occurred after he approached the front door of the residence with a light on, and which served as the basis of the initial search warrant, was sufficiently attenuated from any later police misconduct so as to be purged of any taint. Under these circumstances, I would reverse the trial court.

[25] For these reasons, I respectfully dissent.

---

[12] The copy in the Exhibits Volume is somewhat blurred.