Adron Herschel TANCIL, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 45A03–1101–CR–10.

Court of Appeals of Indiana.

Nov. 21, 2011.

Thomas W. Vanes, Office of the Public Defender, Crown Point, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Katherine Modesitt Cooper, Monika Prekopa Talbot, Deputy Attorneys General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

Adron Herschel Tancil had a disagreement with his girlfriend, Tracey Johnson. He broke her sunglasses, chased her down the street, and threatened to kill her. He caught up with her and pushed and hit her. Tancil then carried the much smaller Johnson into some pitch-black woods and repeatedly punched her head, face, and body for what seemed to her "like a real long time." Tr. at 183. Two nearby residents heard Tancil tell Johnson to shut up or he would kill her, and they called 911. When the police officers finally found Tancil and Johnson, Johnson appeared to be dead. Tancil told the officers, "I know I am going away for a long time." Id. at 323. Johnson suffered significant facial injuries and a traumatic brain injury and was hospitalized for three days, after which she suffered from dizziness, hearing loss, and blurred vision. The State charged Tancil with attempted murder, aggravated battery, battery, and three counts of criminal confinement. A jury found him guilty as charged. Tancil filed a motion for a new trial on the attempted murder count, claiming that the verdict was against the weight of the evidence. The trial court denied the motion, and Tancil now appeals that ruling. Finding no abuse of discretion, we affirm.

### Facts and Procedural History[1]

In May 2010, Tancil and Johnson were in the process of ending their relationship. On the evening of May 15, 2010, Johnson came home to find Tancil waiting for her. The two had a disagreement. Tancil broke Johnson's sunglasses and prevented her from entering her home. Johnson walked away from the house, down the street, and toward a neighbor's walkway. When she reached the end of the block, she saw Tancil running after her. Tancil told Johnson, "Don't run in there. I am going to kill you. Just keep walking." Id. at 176. Johnson began to run. Tancil caught up with her and pushed and hit her. Johnson broke free and ran down the street. Tancil caught up with Johnson again, and she fell. Tancil picked her up and carried her approximately sixty feet into some pitch-black woods. Two nearby residents heard Tancil shout, "Shut the [f**k] up or I will kill you," and "[C]an you accept that[?]" Id. at 143. Those residents called 911. The six-foot, 200–pound Tancil repeatedly punched the five-foot-two Johnson in the head, face, and body. According to Johnson, "[i]t seemed like [the beating lasted] a real long time." Id. at 183. Tancil told Johnson, "When they see you, I am going to be gone for a long time." Id. at 185.

Police officers arrived and unsuccessfully searched the woods with flashlights. When the officers emerged from the woods, one of the residents who had called 911 pointed them in the direction from which the shouting had come. The officers re-entered the woods and found Tancil lying on top of Johnson, who appeared to be dead. Tancil told the officers, "I know I am going away for a long time. And I f** * *ed up. You all might as well just do me right here. Just go and put two in my head." Id. at 323.

Johnson was taken to the hospital. She suffered what Dr. Ruby Long, her attending physician, characterized as a "brain injury consistent with traumatic brain injury," that is, an "injury to the head that is associated with pain, altered mental status, [and] loss of consciousness." Id. at 303.

1. We heard oral argument on October 6, 2011, at the Lorenzo Arredondo Justice Center in East Chicago. We thank the parties for their presentations and our hosts, including attorney Mark Arredondo, for organizing the event.

Her face was significantly swollen and bruised, and she received stitches in her forehead and staples in her mouth. Johnson's hair extensions had been pulled out, along with some of her own hair. She did not suffer any broken bones, however, and a CAT scan was negative for intracranial swelling or bleeding. Johnson spent three days in the hospital, after which she suffered from dizziness, earaches, hearing loss, blurred vision, pain, and swelling.

On May 17, 2010, the State charged Tancil with attempted murder, aggravated battery, battery, and three counts of criminal confinement. A jury trial was held on November 1 and 2, 2010. During a hearing outside the presence of the jury, the trial court remarked sua sponte, "Maybe I am missing something. But this sounds like a battery. The only thing in the evidence to suggest that there may have been an intent to kill would have been the [nearby resident's testimony] that if you don't shut up, I am going to kill you." *Id.* at 234. The jury ultimately found Tancil guilty as charged.

On November 17, 2010, Tancil filed a motion for a new trial on the attempted murder charge pursuant to Indiana Trial Rule 59(J), claiming that the verdict was against the weight of the evidence. On December 14, 2010, the trial court denied Tancil's motion, entered judgment of conviction only on the attempted murder count and one of the criminal confinement counts, and sentenced Tancil to concurrent terms of thirty years and ten years, respectively. Tancil now appeals the denial of his motion for a new trial on the attempted murder charge.

## Discussion and Decision

■ Trial Rule 59(J)(1) authorizes a trial court to grant a new trial "if it determines that prejudicial or harmful error has been committed." "In reviewing the evidence, the court shall grant a new trial if it determines that the verdict of a non-advisory jury is against the weight of the evidence." Ind. Trial Rule 59(J)(7). Our supreme court has held that "a trial judge, in ruling upon a motion to correct errors, has the duty to examine the evidence to ascertain whether or not there is evidence beyond a reasonable doubt to support the verdict of the jury." *Moore v. State,* 273 Ind. 268, 271, 403 N.E.2d 335, 336 (1980).[2] "When ruling on a motion to correct error where the request is for a new trial, the trial court acts as a thirteenth juror and, as such, may weigh the evidence and judge the witnesses' credibility." *Jones v. State,* 697 N.E.2d 57, 59 (Ind.1998); *see also Weida v. Kegarise,* 849 N.E.2d 1147, 1152 (Ind.2006) ("When asked to determine if a new trial is warranted because the verdict is against the weight of the evidence, the trial judge acts as juror rather 'than a mere umpire' and fulfills the judicial role

**2.** Tancil cites *Moore* in a notice of additional authority submitted pursuant to Indiana Appellate Rule 48. In stating the applicable standard of review in their briefs, however, both parties cite *State v. Hollars,* 887 N.E.2d 197 (Ind.Ct.App.2008), *trans. vacated,* in which another panel of this Court said,

> A trial court has wide discretion to correct errors and to grant new trials. In determining whether to grant a new trial, the trial judge has an affirmative duty to weigh conflicting evidence. The trial judge sits as a thirteenth juror and must determine whether in the minds of reasonable men a contrary verdict should have been reached.

*Id.* at 203–04 (quoting *Leroy v. Kucharski,* 878 N.E.2d 247, 250 (Ind.Ct.App.2007), *trans. denied* (2008)). We note that *Hollars* does not contain the "reasonable doubt" language used by our supreme court in *Moore,* presumably because *Leroy* is a civil case in which the reasonable doubt standard did not apply. Although one could argue that the standards enunciated in *Moore* and *Hollars* are the same for all practical purposes, absent any indication that our supreme court has overruled *Moore,* we choose to cite that case as binding precedent for criminal cases.

having 'ke[pt] his eyes and ears open to what was going on during the trial [in order to] pass upon the purely legal questions involved in the case, as well as determine the weight and sufficiency of the evidence to sustain the verdict.' ") (quoting *Bailey v. Kain*, 135 Ind.App. 657, 663–64, 192 N.E.2d 486, 488–89 (1963)).

■ At oral argument, the State asserted that a trial court must employ a sufficiency-of-the-evidence standard when ruling on a motion for a new trial. We disagree with this assertion, chiefly because that standard is geared for appellate review of jury verdicts and specifically prohibits weighing evidence and judging witness credibility. *See, e.g., Caruthers v. State*, 926 N.E.2d 1016, 1022 (Ind.2010) ("In considering challenges to the sufficiency of the evidence, we neither reweigh the evidence nor judge witness credibility."). Based on our reading of the relevant cases, we believe that when ruling on

a motion for a new trial pursuant to Trial Rule 59(J)(7) in a criminal case, a trial court must evaluate the evidence and witnesses subjectively, in keeping with its role as the so-called thirteenth juror, and then make an objective determination whether, based on the probative and credible evidence, a reasonable juror could find the defendant guilty beyond a reasonable doubt.[3] *See, e.g., Mem'l Hosp. of South Bend, Inc., v. Scott*, 261 Ind. 27, 33, 300 N.E.2d 50, 54 (1973) ("On consideration of the granting of a new trial, the trial judge has an affirmative duty to weigh conflicting evidence. The trial judge sits as a 'thirteenth juror' and must determine whether in the minds of reasonable men a contrary verdict should have been reached.") (citations omitted). This analytical framework best preserves the discrete functions and constitutional prerogatives of juries, trial courts, and appellate courts,[4] while ensuring that "substantial

---

**3.** In addressing *Tancil's motion to correct error*, the trial court said,

In order for the Court to set aside a jury verdict, the evidence presented at trial and the elements of the crime must be so contradictory, in many respects to not even equal a crime. To set aside a jury verdict is an extreme remedy and the Court, while it has discretion, for lack of a better word, to second-guess a jury verdict, under Trial Rule 59 that is an extreme remedy.

In this particular case the State correctly points out that two independent witnesses indicated that the defendant dragged the victim into the woods and threatened to kill the victim.

Under these circumstances for this Court to substitute it's [sic] judgment, if in fact it did in fact feel the way that the defense indicates the Court said it did feel during the trial, the Court would have to find that the jury verdict would be unreasonable or improper.

. . . .

In this particular case, the independent witnesses establish the State's theory of intent to kill by the words spoken purportedly by the defendant. Therefore, the Motion for New Trial on Count I is denied.

Tr. at 412–13. In his brief, Tancil asserts that the trial court

misapprehended and understated the standard, that the evidence need not be 'so contradictory,' that it need not be so weak that it doesn't even suggest the commission of a crime, but only of the sort and weight where in the minds of reasonable men, a contrary verdict should have been reached. Appellant's Br. at 8. Tancil's argument is well taken, but given the uncontested photographic and testimonial evidence regarding the severity of Johnson's injuries, as well as the testimony of the independent witnesses regarding Tancil's threats to kill her (which the trial court obviously found credible), we conclude that the trial court nevertheless made the correct decision in this case.

**4.** *See Moore*, 273 Ind. at 269, 403 N.E.2d at 336 ("Article 1, § 19, of the Indiana Constitution vests the authority to determine the law and the facts in a criminal case with the jury. It has been held that the trial court should not weigh evidence, as that would be invading the province of the jury. *See Dean v. State*, (1978) [177] Ind.App. [1], 377 N.E.2d 420. This Court has, however, stated that Article 7, § 1, of the Indiana Constitution, which vests judi-

justice will be done in every case." *Christy v. Holmes,* 57 Ind. 314, 316 (1877).

cial power in the court, should be invoked 'to prevent a travesty on justice.' *Holloway v. State,* (1976) [170] Ind.[App. 155], 352 N.E.2d 523, 529, quoting *Parker v. State,* (1894) 136 Ind. 284, 35 N.E. 1105."); *see also Christy v. Holmes,* 57 Ind. 314, 315–16 (1877) ("It should always be kept in mind, that the rule which governs a circuit court in deciding a motion for a new trial, upon the ground that the verdict is not sustained by sufficient evidence, is very different from the rule which governs the Supreme Court in deciding the same question, when brought before it by appeal. The circuit court presides over the case, knows with what ability or animus it is prosecuted or defended, has the jury and their conduct before it, sees the witnesses, their looks and manners, hears their statements, and knows whether willingly or reluctantly made; in short, sees the actual trial from its beginning and throughout its progress to the end, with all the indices of truth and falsehood before it, from all of which it may judge the question and decide. An appellate court, which is merely a court of error, has nothing of the case before it except the record, in which the words of one witness mean just the same as the same words of another witness; when, perhaps, if the witnesses were seen while they testified, their manner noted, their living voices heard, their intelligence or ignorance of the subject about which they were testifying perceived, one might be entitled to full credit, and the other to not the least. And the living jurors, which come to us merely as so many names, are all before the circuit court, their intelligence or ignorance of the subject they are trying, their conduct or fairness as to prejudice or independence, and many signs of truth and falsehood which can not possibly be put into a record; and when the question has passed the ordeal of all these tests in the circuit court, and a new trial has been denied, the decision comes before us with so many presumptions in its favor that it is almost impossible to obtain a reversal of the judgment under the judicial rule by which we are bound. If, then, there is any evidence to support the verdict, we can not reverse the judgment, because we must suppose it was that evidence which convinced the jury and the court, and the evidence which contradicted it was not credible, and therefore disregarded. . . . In the circuit court, it must clear-

■■■ On appeal, we review a trial court's ruling on a motion for a new trial for an abuse of discretion. *Jones,* 697 N.E.2d at 59.[5] "An abuse of discretion

ly appear that substantial justice has been done by the verdict, or a new trial should be granted; in the Supreme Court, it must clearly appear that substantial justice has not been done, or the judgment should be affirmed. If each court will constantly remember the rule of law which governs it, and always put it into practical effect, then substantial justice will be done in every case.").

5. In *Jones,* the appellant asserted that "the trial court erred in refusing to enter a judgment of acquittal upon his motion for judgment on the evidence or, in the alternative, to grant a new trial." 697 N.E.2d at 58. Our supreme court determined that the appellant was not entitled to judgment on the evidence and then said,

> Upon reviewing a trial court's ruling on motion for new trial, an appellate court is to examine the record to determine whether: "(a) [t]he trial court abused its judicial discretion; (b) [a] flagrant injustice has been done the appellant; or (c) [a] very strong case for relief from the trial court's ordering a new trial has been made by the appellant."

*Id.* at 59 (quoting *Huff v. Travelers Indem. Co.,* 266 Ind. 414, 429, 363 N.E.2d 985, 994 (1977)); *see also Blanchard v. State,* 802 N.E.2d 14, 39 (Ind.Ct.App.2004) (citing *Jones* in addressing appeal from denial of motion for new trial). *Huff* cited *Memorial Hospital v. Scott* for this proposition. 261 Ind. 27, 31, 300 N.E.2d 50, 53 (1973). *Scott* cited *Bailey v. Kain,* 135 Ind.App. 657, 192 N.E.2d 486 (1963), *trans. denied,* which in turn cited *Topper v. Dunn,* 132 Ind.App. 306, 177 N.E.2d 382 (1961). In *Huff, Scott, Bailey,* and *Topper,* the appellants appealed from the trial court's *granting* of a motion for a new trial. Given that Tancil is appealing from the *denial* of a motion for a new trial, we conclude that a simple abuse of discretion standard applies. *Cf. Neher v. Hobbs,* 760 N.E.2d 602, 606 n. 2 (Ind.2002) ("When reviewing a new trial order finding that the verdict is *against the weight* of the evidence under Trial Rule 59, an appellate court examines the record to determine whether (a) the trial court abused its discretion; (b) a flagrant injustice has been done to the appellant; or (c) a very strong

occurs if the decision is clearly against the logic and effect of the facts and circumstances before the trial court." *Butler v. State,* 951 N.E.2d 641, 645 (Ind.Ct.App. 2011). "After an approved verdict, this court can only consider whether there is any evidence which, if believed, will support the verdict." *Harvey v. State,* 541 N.E.2d 556, 559 (Ind.Ct.App.1989) (citing *Moore* ), *trans. denied; Lowery v. State,* 196 Ind. 316, 322, 148 N.E. 197, 197 (1925).

▬ To reiterate, Tancil requested a new trial on the attempted murder charge on the basis that the jury's verdict was against the weight of the evidence. Murder is the knowing or intentional killing of another human being. Ind.Code § 35–42–1–1. "A person attempts to commit a crime when, acting with the culpability required for commission of the crime, he engages in conduct that constitutes a substantial step toward commission of the crime." Ind.Code § 35–41–5–1(a). "An attempt to commit a crime is a felony or misdemeanor of the same class as the crime attempted. However, an attempt to commit murder is a Class A felony." *Id.* Here, the State alleged that Tancil, "while acting with the intent to kill, did intentionally attempt to kill Tracey Johnson by beating and punching her in the face, head and body." Appellant's App. at 33.

Tancil makes the following argument:

The evidence here indicated no conduct other than a beating, albeit a not-insignificant beating, as evidenced by State's Exhibits 19 and 20.[6] Her three-day hospitalization, however, was largely for observation, given the potential for latent neurologic injury. There were no weapons involved. [Tancil] was sprawled across Johnson, but not actively beating her when the police arrived.

Judged by Tancil's physical actions alone, and the injuries that resulted, an attempted murder conviction would clearly be against the weight of the evidence.

It appears here that Tancil was convicted of attempted murder because of what he said as much or more than what he did. As the trial court correctly noted, the evidence suggesting an intent to kill came, if at all, via Tancil's comments during the incident. The [nearby resident] heard Tancil give Johnson an option, or a demand coupled with a threat—shut up or I'll kill you. Johnson herself said that Tancil's homicidal threats came in the context of demands he made that she not run into the woods, that she keep walking. It seems implausible that Tancil's comments, as related by Johnson, were an independent expression of his intended course of action, as opposed to threatened consequences if she failed to obey his commands—did he really want her to walk, to not run into the woods, because he wanted to kill her in plain view on the street? Defense counsel noted in opening statement, and the prosecutor acknowledged in closing arguments, that "words can be exaggerated." The context for the words used by Tancil, in light of his actions here, suggest that his words were such exaggerations, and not the verbalization of his true intent.

Appellant's Br. at 7 (footnote and citations to transcript omitted).

Our supreme court has said,

Intent [to kill] may be inferred from the nature of the attack and the circumstances surrounding the crime. The duration, brutality, and relative strengths of the defendant and victim may also

case for relief has been made.") (citing, inter alia, *Jones,* 697 N.E.2d at 59).

6. These exhibits are two of more than half a dozen photographs depicting Johnson's facial injuries and swelling.

indicate an intent to kill. Additionally, where blows of magnitude are repeated, a jury could conclude that the defendant had an intent to kill.

*Nunn v. State,* 601 N.E.2d 334, 339 (Ind. 1992) (citations omitted). The court has also said that an assailant's words may be indicative of an intent to kill the victim. *See Nicholson v. State,* 500 N.E.2d 1175, 1177 (Ind.1986) ("In the instant case appellant not only used a deadly weapon but in doing so used words which could clearly support the jury's finding that he intended to kill [his victim].").[7]

When Johnson walked toward a neighbor's house after Tancil argued with her and broke her sunglasses, he told her, "Don't run in there. I am going to kill you. Just keep walking." Tr. at 176. It was up to the jury to determine whether Tancil's threat to kill Johnson was conditional or exaggerated or whether Tancil actually intended to carry out that threat. The evidence regarding the attack and its aftermath strongly suggests that he did. Johnson carried the much smaller Johnson sixty feet into some pitch-black woods. Two nearby residents heard Tancil threaten to kill Johnson if she did not shut up. Again, it was up to the jury to determine the import of those threats. Tancil ruth-

lessly pummeled Johnson's head, face, and body for what seemed to Johnson "like a real long time." *Id.* at 183. He told her, "[W]hen they see you, I am going to be gone for a long time." *Id.* at 185. When police officers finally found Johnson, they thought that she was dead. Tancil admitted that he knew that he was "going away for a long time" and asked the officers to "put two in my head." *Id.* at 323. Johnson suffered significant facial injuries and a traumatic brain injury as a result of the beating, as well as dizziness, hearing loss, and blurred vision, and was hospitalized for three days. The foregoing evidence, if believed, was more than sufficient to support the jury's determination that Tancil intended to kill Johnson and engaged in conduct that constituted a substantial step toward doing so. As such, we conclude that the trial court did not abuse its discretion in denying Tancil's motion for a new trial on the attempted murder charge. Therefore, we affirm.

Affirmed.

VAIDIK, J., and BARNES, J., concur.

---

**7.** In *Nicholson,* the assailant told his victim that he was "the reaper" and asked if she wanted "to go to heaven" and if she wanted

him to "send her there." 500 N.E.2d at 1176.