


**FILED**
May 12 2026, 9:05 am
**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Joel Thomas Meyer,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

May 12, 2026

Court of Appeals Case No.
24A-CR-3025

Appeal from the Madison Circuit Court

The Honorable Angela Warner Sims, Judge

Trial Court Cause No.
48C01-2209-F1-2768

---

**Opinion by Judge Scheele**
Judge May concurs. Chief Judge Tavitas concurs in part and concurs
in result in part.

**Scheele, Judge.**

## Case Summary

[1] Throughout the evening and early morning hours of September 16 and 17, 2022, Joel Thomas Meyer drunkenly attacked his fiancée, G.Y., beating her severely. He then slit his forearm with a knife and went outside, leaving a pool of blood in his driveway before returning into the house. Neighbors called police. Responding officers knocked on Meyer's door and spoke with him, first through his front door and later, with his consent, through the back door. Concerned about his and G.Y.'s well-being, officers eventually entered the home, where they found both Meyer and G.Y. seriously injured. Meyer was charged with and convicted of Level 1 felony attempted murder and Level 3 felony criminal confinement.

[2] He now appeals his convictions, arguing the officers' warrantless entry into his home violated the state and federal constitutions and there is insufficient evidence to support the convictions. We affirm his convictions but remand for correction of the abstract of judgment and sentencing order.[1]

## Facts and Procedural History

[3] Meyer and G.Y. met at a rehabilitation facility in May 2021 and began dating a few months later. Both had struggled with alcoholism for years, and Meyer, a

---

[1] We held an oral argument at the Indiana State House on March 17, 2026. We thank counsel for the high quality of their arguments.

veteran, also suffered from post-traumatic stress disorder (PTSD). In February 2022, Meyer purchased a home in Pendleton and G.Y. moved in with him. By this point, the relationship had grown toxic. The two relapsed frequently and spent time in various rehabs. Meyer was often verbally and physically abusive and controlling, including demanding G.Y. sign a contract agreeing to "literally do whatever [Meyer] asks so long it's not immoral or illegal[.]" Tr. Vol. I p. 199.

[4] On September 16, G.Y. picked Meyer up from the hospital, where he had been admitted for several days to "detox" from alcohol. Tr. Vol. II p. 198. On the way home, they stopped at a liquor store and Meyer purchased alcohol. Once home, they began drinking and fighting. By the afternoon, the fighting escalated. Meyer began filming G.Y. on his phone, verbally degrading her while she cried and "making her crawl on her knees to him to apologize." Tr. Vol. I p. 246. Meyer then took an Uber to the liquor store to purchase more alcohol. When he returned, the two continued arguing and it became "physical[.]" Tr. Vol. II p. 11. In one instance, Meyer got angry and "forcefully removed" an engagement ring from G.Y.'s hand. *Id.* at 41. Another time, while in the living room, Meyer pushed G.Y. to the floor and got "on top of" her. *Id.* at 11. He "pinned down [her] arms and his legs were on the top parts of [her] thigh," and she felt a "piercing pain from his leg[.]" *Id.* He told her to leave and she agreed, going to pack a bag and calling an Uber. However, she canceled the Uber because Meyer "got in the way of the door" and "wouldn't let [her] leave." *Id.* at 14.

[5] There was then a "period of de-escalation[.]" *Id.* at 15. Later that evening, "things got more physical." *Id.* Multiple times, Meyer grabbed G.Y. by the hair and dragged her around the house or pinned her to the floor with his hand on her throat. These attacks happened predominantly in the living room. Later, the two were in the bedroom and Meyer "slamm[ed]" her "shoulder," "back[,]" and "head" against the bed's headboard. *Id.* at 18. He began punching her in those areas, including "blows to the head" and left shoulder near where she had a pacemaker. *Id.*

[6] At some point the attacks ended, and G.Y. was lying in bed in "the worst pain" she had ever been in. *Id.* at 20. She heard Meyer leave the home, and he returned around 4 a.m. with more alcohol. Sometime after, he came into the bedroom "with a butcher knife and cut his arms." *Id.* at 22. G.Y., although very injured, got up and tried to stop the bleeding. Meyer was drunk and angry and started pushing and hitting her again. He held her against the bed and smeared his blood over her. He then threw her to the floor and got on top of her, and at that point she lost consciousness. When she awoke, she was alone and got back into bed.

[7] Around this time, Meyer sent a text to a friend stating, "I'm about to go to jail for a long time[.]" Ex. Vol. I p. 162. He sent other texts saying, "Beat her down tonight and don't even remember" and "I blacked out and beat the shut [sic] out her[.]" *Id.* at 164, 166. At 7:50 a.m., Meyer exited the front door, dressed only in underwear and covered in blood. He laid in the driveway for about ten minutes before going back inside. A neighbor saw him and called 9-1-1.

[8] Officer Scott Bertram of the Pendleton Police Department (PPD) was dispatched to the home. Due to previous interactions with Meyer, PPD had advised all officers to respond in pairs to his house because he was "a ticking time bomb." Supp. Ex. Vol. I p. 7. Officer Bertram had been to the home previously and knew Meyer was a combat veteran, suffered from PTSD, was often intoxicated, and that he and G.Y. had "potential domestic violence issues[.]" Supp. Tr. Vol. I p. 55. When Officer Bertram arrived, he saw a "large pool of blood" in the driveway and droplets of blood leading to the front door. *Id.* at 12. He went to the front doorstep and saw an earring on the ground in front of the door.

[9] He knocked and began speaking with Meyer through the closed front door. Officer Bertram repeatedly asked Meyer if he needed help and if an ambulance could assist him, but Meyer refused. Officer Bertram went back to the driveway area to confer with the other officers. Dispatch attempted to call both Meyer and G.Y. multiple times, but neither answered. The officers also confirmed G.Y.'s car was in the driveway.

[10] Officer Bertram then went back and knocked on the door again. Meyer twice told Officer Bertram to "[c]ome in" and Officer Bertram tried but the door was locked. *Id.* at 21; State's Ex. 11, 007, 0:12-0:14. Meyer gave Officer Bertram the front door code, but it did not work. Meyer then told Officer Bertram to "f*ck off" to which Officer Bertram replied, "I can do that but I have to see your girlfriend to make sure she's okay as well." State's Ex. 11, 008, 0:08-0:18. Officer Bertram continued talking to Meyer through the door, asking him if he

or G.Y. would come out to receive medical assistance. At one point, Officer Bertram asked Meyer to come to the door so they could see him, and Meyer replied that he couldn't stand. Officer Bertram suggested they go to the back door because it is glass so they could see him, and Meyer agreed.

[11] Officers went to the back door and knocked, calling out for Meyer and asking about G.Y. Although the door was glass, the blinds were drawn, so officers could not see inside. Officer Bertram opened the sliding glass door a few inches and continued talking to Meyer through the door. During the conversation, the officers heard noises, including someone "moaning or groaning" and later a sound "like skin slapping against a mat or floor . . . [l]ike someone is falling." Supp. Tr. Vol. I pp. 33, 32. One of the officers again asked Meyer about G.Y., and for the first time Meyer confirmed she was in the home. At that point, officers entered through the back door.

[12] Officers found Meyer lying in the living room and G.Y. lying in a bed in the bedroom. Both were covered in blood, as was the house, with large amounts in the living room near Meyer and in the bed. Clumps of G.Y.'s hair were found on the living room floor. Both G.Y. and Meyer were taken to the hospital. G.Y. suffered a subarachnoid hemorrhage—a "small [brain] bleed" that did not require medical intervention—as well as significant bruising and swelling throughout her face and body and various abrasions, particularly to her mouth. Tr. Vol. IV p. 18.

[13] The State charged Meyer with Level 1 felony attempted murder, Level 3 felony aggravated battery, and Level 3 felony criminal confinement. Meyer filed a motion to suppress, arguing the warrantless entry into his home violated the federal and state constitutions. A hearing was held on that motion on August 20, 2024.[2] The trial court issued an order denying the motion to suppress, finding the officers were justified in continuing the knock and talks after being told by Meyer to "f*ck off" and in the warrantless entry due to exigent circumstances. *See* App. Vol. III pp. 67-68.

[14] A bench trial was held in September 2024. The State presented a variety of evidence, including Meyer's text messages, phone videos of him verbally degrading G.Y. and pushing her down, videos from his surveillance system showing his movements outside the home, as well as pictures and videos from law enforcement taken after the warrantless entry and at the hospital. G.Y. testified and acknowledged that she could not give the exact timeline of the attack. She testified they were drinking and arguing most of the afternoon, and Meyer's physical abuse began in the early evening but got worse throughout the night. She confirmed he hit her frequently on her left shoulder near her pacemaker, that he knew her pacemaker was there, and he knew if it was damaged she could die. She further testified as to her injuries, including the

---

[2] Meyer filed a second motion to suppress, arguing statements he made to officers on scene prior to being given *Miranda* warnings should be suppressed. A separate hearing was held on that motion on August 30, 2024, and the trial court issued an order denying that motion.

severe bruising to her arms and legs, which she stated took several weeks to heal and were "[e]xtremely painful." Tr. Vol. II p. 76.

[15] The trial court found Meyer guilty as charged and entered judgment of conviction on all three counts. *See* Tr. Vol. VI p. 121. At sentencing, the court found the aggravated battery conviction "merged" into the attempted murder conviction. *Id.* at 132.[3] The court sentenced Meyer to forty years on the Level 1 felony and ten years on the Level 3 felony, to be served consecutively, for an aggregate of fifty years in the Indiana Department of Correction. Meyer now appeals.

## Discussion and Decision

### I. Admission of Evidence

[16] Meyer argues law enforcement's warrantless entry of his home violated the federal and state constitutions and thus the court erred in admitting any evidence obtained from the entry. We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Speers v. State*, 999 N.E.2d 850, 852 (Ind. 2013). "But where, as here, a constitutional violation is alleged, the proper standard of appellate review is de novo." *Id.*

[17] The Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution protect citizens from unreasonable

---

[3] The abstract of judgment and sentencing order similarly reflect that the conviction for Level 3 felony aggravated battery was merged. App. Vol. III pp. 150-52

searches and seizures. *Holder v. State*, 847 N.E.2d 930, 935 (Ind. 2006). "In spite of the similarity in structure of the federal and state constitutional provisions, interpretations and applications vary between them." *Id.* Because Meyer has alleged violations under the federal and state constitutions, each supported by separate analyses, we examine each of his claims independently. *See id.*

### A. Fourth Amendment

Meyer first argues the officers violated the Fourth Amendment by (1) continuing to conduct knock and talks after he told them to "f*ck off," and (2) by entering his home through the back door. The State contends neither of these actions violated the Fourth Amendment under the emergency-aid exception. We agree.

The Fourth Amendment to the United States Constitution guarantees:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

It is a "basic principle of Fourth Amendment law . . . that searches and seizures inside a home without a warrant are presumptively unreasonable." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (internal quotations and citation omitted). "In addition, the Supreme Court has held that the curtilage—the area 'immediately surrounding and associated with the home'—is 'part of the home itself for

Fourth Amendment purposes.'" *J.K. v. State*, 8 N.E.3d 222, 229 (Ind. Ct. App. 2014) (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). As such, warrantless entry onto one's curtilage is also presumptively unreasonable. *Id.*

[20] However, "law enforcement officers are not strictly prohibited from entering a person's curtilage." *Id.* "It is generally accepted that law enforcement officers enjoy a limited invitation to approach a home through ordinary routes of ingress and egress open to visitors." *Id.* Like other private citizens, an officer may knock on a door and request to speak with an occupant. *Id.* (citing *Jardines*, 569 U.S. at 8). "This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at 8. "Conduct that occurs on one's curtilage that is beyond a traditional 'knock and talk' is subject to Fourth Amendment protection." *J.K.*, 8 N.E.3d at 229.

[21] The Supreme Court has also recognized that the presumption a warrantless entry is unreasonable "may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is reasonableness. Accordingly, the warrant requirement is subject to certain reasonable exceptions." *King*, 563 U.S. at 459 (internal quotations and citation omitted).

> A well-recognized exception is the existence of exigent circumstances. [*Collins v. State,* 822 N.E.2d 214, 218 (Ind. Ct. App. 2005), *trans. denied*]. Under this exception, police officers may enter a residence if the situation suggests a reasonable belief of risk of bodily harm or death, a person in need of assistance, a need to protect private property, or actual or imminent

destruction or removal of evidence before a search warrant may be obtained. *Scott v. State,* 803 N.E.2d 1231, 1235-36 (Ind. Ct. App. 2004). "However, a police officer's subjective belief that exigent circumstances exist is insufficient to support a warrantless search." *United States v. Richardson,* 208 F.3d 626, 629 (7th Cir. 2000), *cert. denied,* 531 U.S. 910, 121 S.Ct. 259, 148 L.Ed.2d 188 (2000). Rather, "as is normally the case for Fourth Amendment inquiries, the test is objective: 'the government must establish that the circumstances as they appear at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house, apartment, or hotel room required immediate assistance.'" *Id.* (quoting *United States v. Arch,* 7 F.3d 1300, 1304 (7th Cir. 1993)). In this light, "[o]fficers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Michigan v. Fisher,* 558 U.S. 45, 49, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009).

*Jones v. State*, 54 N.E.3d 1033, 1036-37 (Ind. Ct. App. 2016), *trans. denied.*

[22] Officer Bertram first made contact with Meyer by knocking on his front door and speaking to him through it. This is a knock and talk through the normal route of ingress and thus does not constitute an unreasonable search. *See Warren v. State*, 73 N.E.3d 203, 207 (Ind. Ct. App. 2017). However, "occupants have no obligation to open the door or to speak to police. And when the knock is not answered, officers generally must leave and secure a warrant if they want to pursue the matter." *Id.* As such, Meyer argues that, after he told Officer Bertram to "f*ck off," the officer's continued attempts to knock on the door and speak to him violated the Fourth Amendment.

[23] Continuing or intensifying knock-and-talk attempts can be reasonable under the Fourth Amendment where there is evidence a person inside may be in need of aid. *See id.* at 208. When he continued his knock-and-talk attempts, Officer Bertram knew the following: Meyer had a history of alcohol abuse and domestic violence with G.Y.; a neighbor had reported Meyer was injured; there was a large amount of blood in the driveway and leading up to the door; G.Y.'s car was in the driveway but she would not answer her cell phone; and Meyer would not answer questions about her welfare. Given this information, it was reasonable for Officer Bertram to continue his knock-and-talk attempts to determine if Meyer or G.Y. needed help. *See Holder*, 847 N.E.2d at 938 (reasonable for officers to expand knock-and-talk attempts to the home's windows, even after the occupants did not answer the front door, where officers had legitimate reason to believe the occupants were in danger).

[24] Next, Officer Bertram went to the back door with Meyer's consent. Once there, he opened the door slightly to continue speaking with Meyer. Meyer confirmed G.Y. was in the house and officers heard "moaning or groaning" and later a sound "like skin slapping against a mat or floor . . . [l]ike someone is falling." Supp. Tr. Vol. I pp. 33, 32. Officers then entered the home. Meyer argues the officers opening the door and eventually entering the home violated the Fourth Amendment.

[25] The State again cites the emergency aid exception and likens this case to *Fisher*, 558 U.S. at 45. There, officers responded to Fisher's home after reports of a disturbance. The exterior of the home was in "chaos," with three broken

windows and a damaged truck with blood on the hood in the driveway. *Id.* at 45. Through a window, officers saw Fisher yelling and throwing things. Officers knocked on the door, but Fisher refused to answer and instead yelled profanities at them. Officers could see Fisher had a cut on his hand, but he refused their attempts to get him medical attention. Eventually, officers entered the home, and Fisher was subsequently arrested for assaulting one of them. Fisher challenged the entry under the Fourth Amendment, and the United States Supreme Court held the entry was reasonable under the emergency aid exception. Specifically, the Court noted the "tumultuous situation" when officers arrived, including the blood outside and Fisher's "violent behavior inside." *Id.* at 48. The Court ultimately concluded "it was reasonable to believe that Fisher had hurt himself (albeit nonfatally) and needed treatment that in his rage he was unable to provide, or that Fisher was about to hurt, or had already hurt, someone else." *Id.* at 49.

[26] The same can be said here. Officers arrived and encountered a clearly tumultuous situation—specifically a large pool of blood in the driveway—and a neighbor had reported Meyer was injured. Officers also knew that Meyer was in the home, that G.Y.'s car was present but she was not answering her phone, and that the two had a history of alcohol abuse and domestic violence. Officers attempted to render aid to Meyer and get information on G.Y., but Meyer refused any help and would not answer questions on G.Y.'s welfare. As officers continued to investigate, additional information added to their concerns. At one point, Meyer tells them he cannot stand, prompting them to go to the back

door, which they open to continue speaking with him. As in *Fisher*, based on these circumstances it was reasonable for officers to believe Meyer had hurt himself or G.Y. This belief was compounded when, after opening the back door, officers got confirmation from Meyer that G.Y. was there and heard sounds associated with injury. Thus, the search was reasonable under the Fourth Amendment, and the trial court did not err in admitting evidence from the search.

## B. Article 1, Section 11

[27]     Article 1, Section 11 of the Indiana Constitution guarantees:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

"The legality of a governmental search under the Indiana Constitution turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances." *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind. 2005). This determination turns on the balance of three factors: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Id.* at 361.

[28] As to the first factor, we agree with Meyer that the officer's degree of concern, suspicion, or knowledge that a violation had occurred was low. Officers ultimately entered the home not due to any concern or suspicion of illegality, but out of concern for its occupants. In *Carpenter v. State*, 18 N.E.3d 998, 1002 (Ind. 2014), our Supreme Court held that, where officers entered the curtilage of a home "not based upon any concern, suspicion, or knowledge that anything illegal was going on inside the home" but rather to "determine if any person needed help[,]" that this "weigh[ed] against the legality of the search."

[29] As to the second factor, generally a warrantless entry into a home is considered a large intrusion. *Barker v. State*, 96 N.E.3d 638, 654 (Ind. Ct. App. 2018), *trans. denied*. However, the intrusion may be mitigated where police "carefully tailor[] their tactics." *Watkins v. State*, 85 N.E.3d 597, 602 (Ind. 2017). Here, the officers spent over thirty minutes attempting to aid Meyer without entering the home. As their concerns for him and G.Y. grew, the officers first went to the back door with Meyer's consent, opening the unlocked door and eventually entering. *See Brown v. State*, 62 N.E.3d 1232, 1237 (Ind. Ct. App. 2016) (officer intrusion into a home lessened where they "were careful in matching their escalating conduct to the escalating urgency of the situation confronting them"), *trans. denied*. Thus, while officers here did enter a private home, their limited actions of opening and entering through an unlocked door to render aid to multiple people lessens the degree of intrusion. *See Snow v. State*, 118 N.E.3d 50, 60 (Ind. Ct. App. 2019) (degree of intrusion of officers entering a private home lessened

where the entry was "limited . . . to ensur[ing] no one in the residence was in need of aid"), *trans. denied*.

[30] Finally, we agree with the State that law enforcement needs were high. "[P]olice officers have a caretaking function as well as an investigatory function." *Barker*, 96 N.E.3d at 654. "It is because of concerns among citizens about safety, security, and protection that some intrusions upon privacy are tolerated, so long as they are reasonably aimed toward those concerns." *Holder*, 847 N.E.2d at 940. As detailed above, when Officer Bertram conducted the knock and talks, he knew Meyer had a history of alcohol abuse and domestic violence with G.Y.; a neighbor had reported Meyer was injured; there was a large amount of blood in the driveway and leading up to the door; G.Y.'s car was in the driveway but she would not answer her cell phone; and Meyer would not answer questions about her welfare. As he continued to speak with Meyer, he learned Meyer could not stand, that G.Y. was in the home, and heard sounds associated with possible injury. Through his caretaking function, Officer Bertram had a high need to ensure the safety of both Meyer and G.Y.

[31] Under the totality of the circumstances, particularly the high level of law enforcement needs and their attempts to lessen the intrusion, we conclude the search was reasonable. *See Montgomery v. State*, 904 N.E.2d 374, 383 (Ind. Ct. App. 2009) (officers acted reasonably in entering hotel room where they had reason to believe there was an emergency and were primarily motivated by intent to give assistance), *trans. denied*. Meyer's rights under Article 1, Section

11 of the Indiana Constitution were not violated, and the court did not err in admitting evidence from the warrantless entry.

## II. Sufficiency of Evidence

## A. Attempted Murder

[32] Meyer next challenges the sufficiency of evidence for his attempted murder conviction. To convict Meyer of Level 1 felony attempted murder, the State was required to prove that, acting with the specific intent to kill, he engaged in conduct that constituted a substantial step toward the killing of another person. *See* Ind. Code §§ 35-42-1-1(1) (2018), 35-41-5-1(a) (2014).

> Intent [to kill] may be inferred from the nature of the attack and the circumstances surrounding the crime. The duration, brutality, and relative strengths of the defendant and victim may also indicate an intent to kill. Additionally, where blows of magnitude are repeated, a jury could conclude that the defendant had an intent to kill.

*Nunn v. State*, 601 N.E.2d 334, 339 (Ind. 1992) (citations omitted); *see also Tancil v. State*, 956 N.E.2d 1204, 1209-10 (Ind. Ct. App. 2011), *trans. denied.* Meyer argues the evidence presented at trial merely showed intent to batter, not specific intent to kill.

[33] Both parties point to *Tancil*, in which we upheld the defendant's attempted murder conviction. There, the defendant, who was six-feet tall and two hundred pounds, chased his girlfriend down the street, yelling threats to kill her. When he reached her, he carried her to a nearby wooded area and repeatedly punched

her in the head, face, and body. When officers found them, the victim appeared to be dead, and the defendant indicated to officers he'd be "going away for a long time." *Id.* at 1205. The victim suffered a brain injury, significant facial swelling and bruising, bits of her hair had been pulled out, and she spent three days in the hospital. However, she escaped any permanent or life-threatening injuries. The defendant was convicted of attempted murder. On appeal, he argued there was insufficient evidence of his intent to kill. Relying on *Nunn*, we affirmed, noting not only the threat to kill, but also "evidence regarding the attack and its aftermath[,]" including the size of the defendant and victim, the length and severity of the attack, and her serious, albeit not life-threatening, injuries. *Id.* at 1210.

[34] Meyer attempts to distinguish *Tancil* by emphasizing that he did not verbalize a threat to kill. While such a threat is strong evidence of intent to kill, it is not required. Rather, we look to all the circumstances of the attack. Similar to *Tancil*, here Meyer—a combat veteran—severely beat G.Y., to the point where responding officers thought she may be dead; he indicated to others afterward that he would likely be incarcerated for a long period of time; and miraculously G.Y.'s injuries, while severe, did not rise to the level of life-threatening. But unlike *Tancil*, here the attack went on throughout the night, and included Meyer dragging G.Y. around by her hair, holding her down with his body, slamming her head against a headboard, verbally degrading her, and repeatedly hitting and punching her. Meyer also focused parts of his attack on G.Y.'s left shoulder and chest, where he knew her pacemaker to be located, and he knew damage to

the pacemaker could kill her. The nature and circumstances of the attack, especially the duration and brutality, sufficiently show a specific intent to kill.

## B. Criminal Confinement

[35] Meyer also challenges the sufficiency of evidence for his Level 3 felony criminal confinement conviction. To convict Meyer of Level 3 felony criminal confinement, the State had to prove he knowingly or intentionally confined G.Y. without her consent and that it resulted in serious bodily injury to G.Y. *See* Ind. Code § 35-42-3-3(b)(3)(B) (2019). Meyer does not challenge that he confined G.Y. but instead contends that the confinement did not result in serious bodily injury. "Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes, among other things, extreme pain, unconsciousness, or permanent or protracted loss or impairment of the function of a bodily member or organ. *See* Ind. Code § 35-31.5-2-292 (2012).

[36] Here, the trial court determined Meyer committed Level 3 felony criminal confinement by confining G.Y. "throughout the evening hours into the early morning hours" and that as a result she sustained various injuries to her hands, arms, and legs and experienced pain. Tr. Vol. VI p. 132. Meyer argues these injuries are "bruises . . . which [do not] arise to the level of serious bodily injury." Appellant's Br. p. 22. But whether bodily injury is "serious" is a question of degree and, therefore, reserved for the finder of fact. *Whitlow v. State*, 901 N.E.2d 659, 661 (Ind. Ct. App. 2009). "[T]here is no bright-line test to distinguish between pain and extreme pain[.]" *Bailey v. State*, 979 N.E.2d 133, 141 n.17 (Ind. 2012). We have previously found sufficient evidence of

extreme pain, and thus serious bodily injury, where the victim was struck repeatedly, causing marks and leaving her in pain "she had never felt anything close to" before. *See Whitlow*, 901 N.E.2d at 660; *see also Buckner v. State*, 857 N.E.2d 1011, 1018 (Ind. Ct. App. 2006) (sufficient evidence of serious bodily injury where defendant repeatedly struck victim with his hands and fists, causing her severe pain and leaving marks on her body).

[37] Here, G.Y. testified as to an ongoing attack by Meyer in which he repeatedly held her down and laid on top of her, pinned her to the ground, and dragged her around by her hair. She later identified pictures of her arms, showing extensive bruising, and stated those were caused by Meyer holding her down. She also identified pictures of the deep bruising on her thighs and testified these were from when Meyer held her down and that the bruising lasted several weeks. She defined the pain from Meyer holding her down specifically as "piercing[,]" "sharp[,]" and "[e]xtremely painful." Tr. Vol. II pp. 11, 64, 76. This is sufficient evidence from which the trial court could determine G.Y. experienced extreme pain and thus serious bodily injury.

## III. Conclusion

[38] We therefore affirm Meyer's convictions for Level 1 felony attempted murder and Level 3 felony criminal confinement.

[39] However, we remand for a correction in the court's abstract of judgment and sentencing order, which state that Count II: Level 3 felony aggravated battery should be "merged" into Count I: Level 1 felony attempted murder. *See* App.

Vol. III pp. 150-52. "A trial court's act of merging, without also vacating the conviction, is not sufficient to cure a double jeopardy violation." *Gregory v. State*, 885 N.E.2d 697, 703 (Ind. Ct. App. 2008). We therefore remand this cause to the trial court with an order to vacate Meyer's conviction for aggravated battery.[4]

May, J., concurs. Tavitas, C.J., concurs in part and concurs in result in part.

ATTORNEYS FOR APPELLANT

Jennifer Jones Auger
Law Office of Jennifer Auger
Franklin, Indiana

Andrew J. Baldwin
Baldwin, Perry, & Wiley, P.C.
Franklin, Indiana

Kinsey H. Chaney
Certified Legal Intern
Baldwin, Perry, & Wiley, P.C.
Franklin, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Justin F. Roebel
Supervising Deputy Attorney General
Indianapolis, Indiana

---

[4] Meyer also argues (1) there is insufficient evidence to support his conviction for aggravated battery and (2) his convictions for aggravated battery and criminal confinement violate substantive double jeopardy. Because we are remanding for vacation of the aggravated battery conviction, we need not address these arguments.

**Tavitas, Chief Judge, concurring in part and concurring in result in part.**

[40] I fully concur in the majority's holding that sufficient evidence supports Meyer's convictions and that the entry into his home did not violate the Fourth Amendment. And, although I agree that the entry into Meyer's home was reasonable under Article 1, Section 11, I write separately because I respectfully disagree with the majority's analysis of the first *Litchfield* factor.

[41] Our analysis under Article 1, Section 11 begins with the general rule that a warrant is required for entry into a home. *See Carpenter v. State*, 18 N.E.3d 998, 1002 (Ind. 2014) ("[W]arrantless searches of a home are presumptively unreasonable."). One of the exceptions to the warrant requirement is the existence of "exigent circumstances." *Willis v. State*, 780 N.E.2d 423, 428 (Ind. Ct. App. 2002) (citing *Hawkins v. State*, 626 N.E.2d 436, 438-39 (Ind. 1993)). Here, the police entered due to the existence of exigent circumstances to render aid. Applying the *Litchfield* factors to these exigent circumstances shows that the officers' actions were reasonable under the totality of the circumstances.

[42] The first *Litchfield* factor is the degree of concern, suspicion, or knowledge that a "violation" has occurred. 824 N.E.2d at 361. Here, however, the police did not enter Meyer's home due to any degree of suspicion that a *crime* had been committed. Instead, they entered the home because of a concern that someone was seriously injured and in need of immediate aid. Even though such circumstances do not fit precisely within the first *Litchfield* factor, our Supreme

Court has held that Article 1, Section 11 "allows warrantless entry into a home when an officer has objectively reasonable grounds to believe immediate aid is needed inside." *Carpenter*, 18 N.E.3d at 1002; *see also Wilford v. State*, 50 N.E.3d 371, 375 (Ind. 2016) (noting that police officers are not only expected to enforce criminal laws but also "aid those in distress . . . and provide an infinite variety of other services to preserve and protect community safety."). And this Court has previously recognized that, in the context of rendering emergency aid, the first *Litchfield* factor is properly considered as "the degree of concern that *emergency medical assistance* was needed." *Randall v. State*, 101 N.E.3d 831, 841 (Ind. Ct. App. 2018) (emphasis added) (citing *M.O. v. State*, 63 N.E.3d 329, 333 (Ind. 2016)).

[43] The majority's analysis of the first *Litchfield* factor, relying on *Carpenter,* is incorrect because the majority misreads *Carpenter.* The majority relies on *Carpenter* to hold that, if a person is in need of aid, this "weighs against the legality of the search." *Supra*, p. 15 (quoting *Carpenter*, 18 N.E.3d at 1002). But *Carpenter* involved a bloody dog in a fenced-in yard. No person was in danger, the dog was alive, and there was no urgent need to act; in short, there were no exigent circumstances at all. *Carpenter*'s statement that the first factor "weigh[ed] against" the legality of the search was based on these non-exigent circumstances.

[44] In contrast, here, a neighbor observed Meyer lying on his driveway in a pool of blood. The neighbor's wife called 911, and Meyer staggered back into his home. When the responding officers arrived, they found a large amount of

blood in the driveway and a blood trail leading to the front door. G.Y.'s car was in the driveway, and G.Y. did not respond to calls to her phone. Meyer had a known history of alcohol abuse and domestic violence with G.Y., which increased the officers' concern for her safety. When one of the officers knocked on Meyer's door, Meyer was barely intelligible. Still, Meyer initially gave the officers the code to the door, which did not work. Meyer then told the officers to "f*ck off." State's Ex. 11, 008. When the officers responded that they still needed to check on G.Y., Meyer gave incoherent responses.

[45] These exigent circumstances weigh in favor of, not against, a finding that the officers' actions were reasonable under the totality of the circumstances. *See Randall*, 101 N.E.3d at 841-42 (holding that warrantless seizure of defendant was reasonable under *Litchfield* factors where police observed defendant slumped over the steering wheel of a car with its door open in a hospital parking lot; degree of intrusion was minimal because officer simply told defendant to return to his vehicle; and law enforcement need, though relatively low, did not overcome the balance favoring the brief seizure), *trans. denied*.